MATTHEW FRANK ROWBOTTOM, Appellant, *v.* THE STATE OF NEVADA, Respondent.

No. 19294

August 23, 1989                                    779 P.2d 934

*David G. Parraguirre,* Public Defender, and *Karen Grifall,* Deputy Public Defender, Washoe County, for Appellant.

*Brian McKay,* Attorney General, Carson City; *Mills Lane,* District Attorney, and *Larry Sage,* Deputy District Attorney, Washoe County, for Respondent.

## OPINION

*Per Curiam:*

A jury convicted appellant Matthew Frank Rowbottom (Rowbottom) of first degree murder with use of a deadly weapon. He now appeals from the district court's judgment of conviction and contends: (1) that the district court erred in denying his motions to suppress evidence; (2) that the district court erred in admitting evidence of his prior misconduct; and (3) that the district court erred in denying his motion for a new trial based on juror misconduct. For the reasons set forth below, we reverse and remand for a new trial.

## THE FACTS

In the early afternoon of August 26, 1987, a Reno Disposal Company driver discovered Ivy Pregozen's (Ivy) body on East Commercial Row in Reno. An autopsy revealed that Ivy died from multiple stab wounds. She had been stabbed five times in the chest and abdomen, four times in the back, and her neck had been slashed twice. In addition, Ivy suffered abrasions and bruising about her head and face, she had been sexually assaulted, and a plastic bindle tie ligature had been applied to her wrists. With the exception of two wounds to the back, all of Ivy's wounds and injuries, as well as the placement of the ligature, occurred prior to her death.

As part of their investigation of the murder, Reno Police Detectives contacted and interviewed those persons who last saw Ivy alive on the evening of August 25th. Ultimately, on August 27th, Detective Michael Neville contacted Rowbottom. Rowbottom agreed to be interviewed and voluntarily accompanied Detective Neville to the police station. Shortly after the interview commenced, detectives asked if Rowbottom would consent to a search of his residence and vehicle. Rowbottom refused to grant permission for a search of his apartment explaining, without being asked, that he had illegal pyrotechnics there that he had taken from his Nevada National Guard unit. He voluntarily consented to a search of his vehicle, however.

When the detectives read the vehicle search consent form to Rowbottom, he apparently manifested some confusion. The

detectives therefore explained the form fully and advised Rowbottom of his *Miranda* rights as well. Afterwards, Rowbottom verbally indicated that he understood his rights and signed the consent to search form.

The interview terminated when Rowbottom and Detective Neville went to the Sands Regent Hotel and Casino where Rowbottom worked and his vehicle was parked. Detective Neville later testified that he and Rowbottom were alone and that Rowbottom was neither in custody nor in handcuffs. A search of Rowbottom's vehicle revealed two small clumps of reddish colored sand similar to that present in the area in which Ivy's body had been discovered. When police found the sand, Rowbottom stated, without being asked, that it had been there since he purchased the vehicle. Police tested the sand and determined it to be presumptively positive for the presence of human blood. When asked, Rowbottom denied that Ivy had ever been in his vehicle; however, police removed a latent finger print from the right corner of the vehicle's inside rear view mirror that matched that of Ivy's right middle finger. Police also observed that the tread on the vehicle's tires was similar to that found in tire impressions left at the murder scene. Following the vehicle search, Rowbottom again voluntarily accompanied Detective Neville to the police station where, at approximately 5:30 p.m., the interview resumed.

While other detectives interviewed Rowbottom, Detective Neville with the aid of a deputy district attorney requested a warrant to search for the illegal pyrotechnics believed to be in Rowbottom's apartment. When the magistrate from whom the police requested the warrant inquired if the police also wished to search for evidence linking Rowbottom to Ivy's murder, the deputy district attorney indicated that he believed that sufficient probable cause to request such a warrant was lacking. The deputy district attorney informed the magistrate that if, while searching for the pyrotechnics, the police discovered evidence linking Rowbottom to the murder they would discontinue the search and request another warrant for that evidence. Thereafter, the magistrate issued a warrant for the requested search.

Soon after entering Rowbottom's apartment, police observed in plain view evidence which they believed would connect Rowbottom to Ivy's murder. The police halted their search, secured the residence, and requested and obtained a second search warrant. Among the items discovered and seized during execution of the second warrant were Ivy's purse, a fixed blade hunting knife and sheath with what appeared to be blood stains on the sheath, a pair of Rowbottom's trousers with what appeared to be blood stains on

one of the knees, and a plastic bindle tie similar to that used to bind Ivy's wrists.[1] The police also discovered and seized various Nevada National Guard pyrotechnics, including star cluster flares, parachute flares, and grenade simulators.

In time, detectives informed Rowbottom of their discoveries, and, at approximately 1:00 a.m. on August 28th, Rowbottom confessed to killing Ivy. According to Rowbottom's confession, he, Ivy, and some other employees of the Sands Regent met at a bar there on the evening of August 25th and later had dinner and more drinks at a nearby pizza parlor. Prior to leaving the pizza parlor, he and Ivy agreed to meet again at the Sands Regent after Ivy returned from driving her friends to the friends' home in Sparks. Rowbottom told the police that he arrived at the Sands Regent first and when Ivy arrived she joined him in his vehicle. Together they left, purchased beer at a convenience store, and drove to a secluded location where they drank the beer and began petting. Subsequently, according to Rowbottom, Ivy became upset, terminated the activity, and exited the vehicle. Rowbottom followed taking with him a knife he kept in the vehicle. He threatened Ivy with the knife, they struggled and fell to the ground, and the knife accidently entered her back. Rowbottom indicated that he then "went crazy" and stabbed Ivy repeatedly in the chest and back. When asked, Rowbottom told the police that after he killed Ivy he took a plastic bindle tie from his car and placed the ligature on Ivy's wrists. Rowbottom vigorously denied having sexually assaulted Ivy, however.

Rowbottom's initial statement to police regarding his possession of illegal pyrotechnics, as well as the evidence found at his apartment and his ultimate confession to the murder, were the subject of various motions in limine to suppress. The district court denied each of the motions.

At trial, counsel stipulated to the admission of an exhibit that depicted various locations visited by those present on the evening of August 25th. The exhibit also depicted the location of Rowbottom's apartment. The prosecution used the exhibit to advance its theory of premeditation, *i.e.,* that Rowbottom, intending to kill Ivy, returned to his apartment where he obtained the plastic

---

[1]During the prosecution's case in chief, a Reno Police Department Criminalist testified that the sand found in Rowbottom's vehicle, as well as the stains found on the knife sheath and on Rowbottom's trousers' knee, contained human blood, that the blood was inconsistent with Rowbottom's, but that it was consistent with Ivy's. The criminalist also testified that semen found in Ivy's vaginal cavity was from a B secretor, that Rowbottom was a B secretor and in the 16th percentile group of the population who could have donated the semen, but that Ivy's boyfriend was excluded as having been the semen donor.

bindle tie and the murder weapon, prior to meeting Ivy back at the Sands Regent.

Rowbottom testified in his own defense. Rowbottom did not deny that it was he who sexually assaulted and killed Ivy; he admitted that the events must have happened. He claimed, however, that he did not remember committing the crimes. Rowbottom's defense was that he did not commit the crimes with premeditation, but rather, they happened while he was experiencing a "dissociative state." In attempting to establish the reasons for his experiencing dissociative states, Rowbottom testified about his traumatic and unhappy childhood, including his being taken on occasions from his family and being placed in foster homes.

Regarding the night in question, Rowbottom testified that the plastic bindle tie used to bind Ivy's wrists was already in his vehicle. Rowbottom testified further that he bound Ivy's wrists while both he and Ivy were in his vehicle after she commented, following an unsuccessful attempt at sexual intercourse, that he was "a nonsatisfying person." According to Rowbottom, when Ivy complained that the tie was too tight, he exited his vehicle taking with him a knife he kept there and went to the vehicle's passenger side to remove the ligature. By the time he reached the vehicle's passenger side, Ivy, whose hands were bound, had exited. Rowbottom continued stating that both he and Ivy fell, he hit his head on the ground, and the last thing he remembered was attempting to cut the ligature from Ivy's wrists.

Among the witnesses called by the defense was Rowbottom's mother, a felon convicted of child abuse, who reluctantly testified that as a child Rowbottom suffered physical abuse from herself, his stepparent, and foster parents. Following a hearing outside the presence of the jury and over the defense's objections, the district court gave a limiting instruction to the jury and permitted Rowbottom's mother to testify on cross-examination that as an adolescent Rowbottom, on numerous occasions, forced his younger sister to fondle and perform fellatio on him.

The jury found Rowbottom guilty of first degree murder with use of a deadly weapon, and, following a penalty hearing, set the penalty to be imposed at death. Shortly thereafter, a juror contacted the public defender's office and reported numerous instances of juror misconduct. The alleged misconduct involved, among other things, a juror conducting an independent investigation to determine whether Ivy could have exited the vehicle with her hands bound as Rowbottom claimed. The same juror also measured the driving times between various locations to determine whether, as the State contended, Rowbottom could have

returned to his apartment and obtained the ligature and knife before meeting Ivy at the Sands Regent. In addition, the juror visited the murder scene and compared the gravel there with that depicted in the pictures of Ivy's body which had been admitted into evidence. The juror also engaged in communication with Ivy's parents, and ultimately related her findings and conclusions to the other jurors. Finally, the juror indicated to the other jurors that they should pay heed to her opinions because she had previously served on other murder cases.

Rowbottom moved the district court for a new trial based on the juror misconduct. Thereafter, the district court held a hearing to determine whether the alleged misconduct occurred, and, if so, its nature and extent. At that hearing, only the offending juror denied the allegations of misconduct; however, the other jurors' testimony conflicted regarding when, either during or after the guilt phase, the offending juror made known her findings and conclusions.

The district court found that the misconduct occurred as alleged, that it was significant because it related directly to the issues of premeditation and credibility, but that "it was not crucial or related to all the State's theories," i.e., the State's theory that Rowbottom committed the murder in the perpetration of a sexual assault. The district court also found that the offending juror engaged in her misconduct during the guilt phase of the trial, but that she did not communicate her findings to the other jurors until during the trial's penalty phase. Because it considered the evidence of Rowbottom's guilt to be overwhelming, the district court concluded that the misconduct that occurred during the trial's guilt phase was harmless beyond a reasonable doubt. It therefore denied Rowbottom's motion for a new trial. The district court was not convinced, however, that the offending juror's communicating her findings to the other jurors during the trial's penalty phase was harmless, and it vacated the sentence of death and ordered that a new penalty hearing be held. This appeal ensued.

## DENIAL OF SUPPRESSION MOTIONS

1. Rowbottom contends that because the police lacked probable cause on which to arrest when they first contacted him, his presence and interview at the police station was tantamount to an illegal seizure of his person and in violation of the Fourth Amendment to the United States Constitution. Therefore, argues Rowbottom, the district court erred in not suppressing the un-Mirandized, incriminating statements regarding his possession of Nevada National Guard pyrotechnics, as well as other "fruits" derived therefrom. We do not agree.

An individual's mere presence for questioning at a police station is not dispositive of whether a seizure of the person has occurred within the meaning of the Fourth Amendment. Oregon v. Mathiason, 429 U.S. 492 (1977). The test to determine if such a seizure has occurred is whether, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." United States v. Mendenhall, 446 U.S. 544, 554 (1980) (footnote omitted).

After a hearing on Rowbottom's suppression motion, the district court found, based on the totality of facts and circumstances, that Rowbottom's admission was "not barred by Miranda, and [was] not involuntarily made while in custody." Implicit in the district court's findings is its belief that a reasonable person would have believed himself free to leave. We believe that substantial evidence supports the district court's conclusion. As the district court observed in its order denying Rowbottom's motion, when Rowbottom made the statement regarding the pyrotechnics the police had told him several times previously that he was free to leave. Moreover, Rowbottom's own testimony was that he accompanied Detective Neville to the police station and there participated in the questioning voluntarily. Accordingly, we conclude that the police neither seized Rowbottom's person any time prior to his incriminating statements nor did they violate his Fourth Amendment rights. *See* Crew v. State, 100 Nev. 38, 675 P.2d 986 (1984).

2.   Rowbottom next contends that the basis articulated by the police to obtain the initial warrant to search his apartment was pretextual as the police had no interest in searching for pyrotechnics, but instead wanted to search for evidence linking him to Ivy's murder. Therefore, in Rowbottom's view, the district court erred in not invalidating both the initial and subsequent search warrants and in not suppressing the evidence obtained from both searches of his apartment. Again, we disagree.

Preliminarily, we reject Rowbottom's contention that the police had no interest in searching his apartment for the pyrotechnics he admittedly pilfered from his National Guard unit. Recovering hazardous and potentially life threatening military pyrotechnics from a residential apartment complex implicates serious public safety concerns and is by no means trivial. Although the police may have had the additional interest of discovering evidence of Ivy's murder, the record clearly indicates that in applying for the initial search warrant they neither engaged

in pretext nor subterfuge. The police, as well as the Deputy District Attorney, fully apprised the issuing magistrate of the circumstances surrounding the situation, and in executing the initial warrant the police did not exceed its scope. Indeed, when the detectives observed Ivy's purse and the alleged murder weapon both items were in plain view. After observing the items, the police discontinued their search and left the premises until they could obtain the second warrant. In so doing, the police clearly went beyond that which was required of them.

A situation analogous to that presented here occurred in United States v. Kimberlin, 805 F.2d 210 (7th Cir. 1986). There, FBI agents suspected the appellant of possessing contraband Department of Defense identification cards and facsimiles of the Presidential Seal. Bureau of Alcohol, Tobacco, and Firearms (BATF) agents also suspected the appellant of having committed several bombings. Based on probable cause, FBI agents obtained a warrant to search the appellant's automobile. When they executed the warrant, BATF agents were present. The BATF agents observed incriminating items, and subsequently obtained a second warrant to search the vehicle. The appellant sought to have his convictions for the bombings overturned arguing that the initial warrant obtained by the FBI was but a subterfuge to search for evidence of the bombings. The United States Court of Appeals for the Seventh Circuit rejected the appellant's argument stating: "We are not persuaded that [the BATF agents'] interest in and presence at the search, or even their having encouraged the search, if they did so, made the search unreasonable." *Id.* at 229. The court of appeals premised its conclusion on its belief that although the offenses that the FBI was investigating were misdemeanors, the offenses "were not trivial, and the FBI had a legitimate interest in pursuing them." *Id.*

As indicated above, we too believe that the police in the instant matter had a legitimate interest in conducting their search. The warrant they obtained was based on probable cause, and their search of Rowbottom's apartment was not unreasonable. While lawfully on the premises pursuant to the warrant, the police observed evidence of another, more serious crime. Accordingly, we reject Rowbottom's argument that the police obtained the initial warrant to search by pretext and conclude, therefore, that the district court did not err in denying Rowbottom's motion to suppress the evidence discovered in his apartment.

3. Rowbottom's final contention in this area is that during police questioning, which lasted in excess of ten hours, he was subjected to coercive interrogation techniques, his will was overborne, and he degenerated into a psychotic state. Thus, according to Rowbottom, his confession was involuntary and should have been suppressed. Once again, we do not agree.

■■■■■

A confession is inadmissible unless freely and voluntarily made. Passama v. State, 103 Nev. 212, 213, 735 P.2d 321, 322 (1987) (citing Franklin v. State, 96 Nev. 417, 421, 610 P.2d 732, 734-35 (1980)). "In order to be voluntary, a confession must be the product of a 'rational intellect and a free will.'" Id. at 213-14, 735 P.2d at 322 (quoting Blackburn v. Alabama, 361 U.S. 199, 208 (1960)). A confession's voluntariness is determined by considering the effect of the totality of the circumstances on the will of the defendant. Id. at 214, 735 P.2d at 323. Among the factors to be considered in determining whether a defendant's will has been overborne are:

> [T]he youth of the accused; his lack of education or his low intelligence; the lack of any advice of constitutional rights; the length of detention; the repeated and prolonged nature of questioning; and the use of physical punishment such as deprivation of food or sleep.

Id. (citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)).

■■■■■

Our review of the record convinces us that the district court did not err in refusing to suppress Rowbottom's confession. In considering the factors set forth in Passama, upon which Rowbottom bases his assignment of error, we note first that Rowbottom's age—twenty seven years at the time of the interview—is not significant. Nor is Rowbottom's claim of low intelligence entitled great weight. Although not highly educated, Rowbottom, who possesses a high school equivalency (GED) certificate, was able to obtain the rank of sergeant in his National Guard unit. The record before us dispels any question that Rowbottom lacked knowledge of his constitutional rights. The police informed Rowbottom of his rights as required by Miranda v. Arizona, 384 U.S. 436 (1966), and, at the hearing on his suppression motion, Rowbottom himself testified that he understood and knowingly waived those rights.

■■■■■

Although the police interview with Rowbottom was of longer duration than that involved in Passama, nothing suggests to us that Rowbottom's will was overborne as a result of the interview's length. Nor are we inclined to establish any set time limitation on police questioning. Instead, we believe that each situation should be evaluated according to its particular facts and circumstances. Here, the police conducted the interview in two stages. The first stage terminated when Rowbottom accompanied

Detective Neville to witness the vehicle search. After the interview resumed and had continued for some time, the police permitted Rowbottom to take a break and "stretch his legs." Rowbottom never indicated to the police at any time during his questioning that he was tired or wished, for any reason, to discontinue the interview. Neither are we persuaded by Rowbottom's argument that the police subjected him to physical punishment during the interview by depriving him of food and sleep. This argument is contrary to the testimony presented at the hearing on the motion, including Rowbottom's.

Finally, although an expert testified that Rowbottom had degenerated into a psychotic state during the questioning, we note that Reno Police Investigator Floyd Siristo testified that Rowbottom was rational and appeared to know what he was doing throughout the interview. The district court, as the trier of fact for purposes of the suppression motion, was not required to accept the expert's testimony as correct or true. We conclude, therefore, that substantial evidence supports the district court's conclusion that Rowbottom's confession was voluntary and that the district court did not err in denying Rowbottom's motion to suppress.

## EVIDENCE OF PRIOR MISCONDUCT

Rowbottom next contends that the district court erred in permitting his mother to testify that on several occasions he forced his sister to fondle and to perform fellation on him. In Rowbottom's view, this testimony was contrary to NRS 50.085(3)[2] and was prejudicial. We agree.

Testifying in his own defense, Rowbottom told of his traumatic childhood, but stated that he enjoyed a close relationship with his sisters. On cross-examination, the prosecution inquired briefly into Rowbottom's familial relationship.[3] The defense subse-

---

[2]NRS 50.085(3) provides:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime, may not be proved by extrinsic evidence. They may, however, if relevant to truthfulness, be inquired into on cross-examination of the witness himself or on cross-examination of a witness who testifies to an opinion of his character for truthfulness or untruthfulness, subject to the general limitations upon relevant evidence and the limitations upon interrogation and subject to the provisions of NRS 50.090.

[3]The prosecution's inquiry is reflected in the following exchange:

> Q [MR. LANE]: Okay. You say you were close to your sisters, correct?
> A [ROWBOTTOM]: Yes.
> Q: Did you like them?

quently called Rowbottom's mother to testify. When the prosecution inquired on cross-examination about one of Rowbottom's younger sisters, defense counsel interrupted and asked to approach the bench. Thereafter, the district court excused the jury and heard an offer of proof regarding the witness's expected testimony.[4] *See* Petrocelli v. State, 101 Nev. 46, 692 P.2d 503 (1985). The district court then indicated that it would admit the proffered testimony over the defense's objections that it was inadmissible evidence of bad acts and hearsay. The district court stated: "If nothing else, I'm going to admit it for that purpose to show the family relationship, not for, naturally, not—the act is not admissible—it tends to prove that he committed this offense. . . ." When the jury returned, the district court gave a limiting instruction stating:

> It's admissible not for whether or not the incident therein actually happened or if it did, it tends to show that the defendant committed the crimes in question, but only for the purpose of showing the relationships between and this family situation of Mr. Rowbottom and it's already been testified to, his inter-relationship of the family and his relationship between him and his sisters.

Rowbottom's mother then testified about Rowbottom's alleged past misconduct.

---

A:  I more have love for them.
Q:  I beg your pardon?
A:  I have love for them.
Q:  Does that mean that you do not like them, but you love them?
A:  I like them. I also love them as my sisters.
Q:  And, of course, is there any reason why you would harbor any ill will toward them for any reason?
A:  Repeat that.
Q:  Feel bad about them because they're female. You don't feel bad about your sisters, do you?
A:  I feel sorry for them.

[4]The following exchange occurred between the district court and the prosecution:
THE COURT:  He brought it out about testifying about the love of his sisters?
MR. LANE:  How it tore him up to be away from them.
THE COURT:  How he was torn away from them, not by his own volition, but through his mother and stepfather, I guess.
MR. LANE:  Yes, and because of the various foster—he testified one time it tore him up because they were split up, they got taken away, the sisters went to a foster home and he went to a different foster home.
THE COURT:  It's evidence then *in contradiction of his testimony* concerning the relationship between him and his sisters for one thing?
MR. LANE:  Yes, sir.
THE COURT:  What else?
MR. LANE:  Well, it is evidence of the relationship of Matthew

In Rembert v. State, 104 Nev. 680, 766 P.2d 890 (1988), we held that it was error to allow the State to attempt to impeach a defendant's credibility with extrinsic evidence relating to a collateral matter. *See also* Moore v. State, 96 Nev. 220, 605 P.2d 105 (1980). We believe that is what occurred here. Rowbottom testified that he loved and enjoyed a close relationship with his sisters apparently in order to show the traumatic effect that being removed from his family during his childhood had upon him. Had the prosecution wished to rebut this testimony and impeach Rowbottom's credibility with specific instances of conduct it could have done so by inquiring about Rowbottom's alleged prior misconduct during *his* cross-examination. NRS 50.085(3), *supra.* If Rowbottom denied having committed the act, the prosecution could not, however, prove specific instances of conduct by extrinsic evidence, *i.e.,* Rowbottom's mother's testimony. *Rembert,* 104 Nev. at 682-83, 766 P.2d at 892; Moore v. State, 96 Nev. at 224-25, 607 P.2d at 107-08 (1980).

Moreover, to the extent, if any, that the district court admitted the testimony of Rowbottom's mother simply to show the relationship that existed between Rowbottom and his family, the district court erred. NRS 48.045(2) provides:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of *motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.*

(Emphasis added.) Admitting the testimony of Rowbottom's prior bad acts to show the "inter-relationship of the family and his relationship between him and his sisters," is not one of the purposes for which evidence of bad acts is admissible.

## JUROR MISCONDUCT

Rowbottom's final contention is that the district court erred in denying his motion for a new trial based on juror misconduct. Rowbottom argues that the district court's conclusion that the juror misconduct was harmless beyond a reasonable doubt is erroneous. Given the sheer quantity of juror misconduct, its particularly egregious character, and the seriousness of the crime

---

Rowbottom within the family situation which has been explored here with this witness.

(Emphasis supplied.)

charged, we conclude that the district court's characterization of the misconduct as harmless was erroneous and that the district court abused its discretion in denying Rowbottom's motion for a new trial.

Whether a defendant is prejudiced by juror misconduct is a fact question to be determined by the trial court, and its determination will not be disturbed on appeal in the absence of a showing of an abuse of discretion. Barker v. State, 95 Nev. 309, 313, 594 P.2d 719, 721-22 (1979). In determining whether juror misconduct constitutes harmless or prejudicial error a trial court must consider "whether the issue of innocence or guilt is close, the quantity and character of the error, and the gravity of the crime charged." Big Pond v. State, 101 Nev. 1, 3, 692 P.2d 1288, 1289 (1985).

Following the hearing on Rowbottom's motion for a new trial, the district court found that the juror misconduct occurred as alleged during the guilt phase, but that it was shown that the offending juror did not communicate her findings to the other jurors until the trial's penalty phase.[5] This finding was contrary to the testimony of three jurors who believed the offending juror communicated her out of court findings to the other jurors during the guilt phase. The district court concluded that the misconduct was harmless beyond a reasonable doubt with respect to the guilt phase and ordered a new trial on the penalty phase only.

In concluding that the misconduct was harmless, the district court overlooked a factor implicit in its finding that the misconduct occurred and that factor was significant because it related directly to the issues of premeditation and credibility. Even if the offending juror did not disclose her conclusions to the others during the guilt phase, she returned to and participated fully in the jury deliberations while being influenced, in whole or in part, by her out of court investigations.[6] We cannot say beyond a

---

[5]The district court also found, as alleged, that one other juror committed misconduct by reading newspaper accounts of the trial. The district court determined that this misconduct, too, was harmless beyond a reasonable doubt because the juror did not recall the newspaper accounts and because the accounts did not contain information other than that admitted into evidence at trial. In addition, the record reveals that during the hearing on the motion, another juror admitted to driving by the scene of the murder.

[6]The misbehaving juror's conduct and testimony denying any misconduct may well have exposed her to criminal liability. We are hopeful that the Washoe County District Attorney's office has adequately reviewed her conduct to determine if criminal prosecution is warranted. The cost and delay she has caused in this case are substantial.

reasonable doubt that in so participating she did not inject opinions developed as a result of her particularly egregious misconduct and thus infect the other jurors in their deliberations.

Faced with the vast quantity and egregious character of the misconduct, and considering the seriousness of the crime charged, we therefore do not believe it can be said beyond a reasonable doubt that the jury's verdict would have been the same, at least in the degree attached to the crime, had the misconduct not occurred. Our judicial system guarantees every defendant a fair trial with impartial jurors deciding a case only on admissible evidence presented in court. Conduct which erodes these basic tenets will be presumed prejudicial. *Cf.* Sipsas v. State, 102 Nev. 119, 716 P.2d 231 (1986).

The offending juror apparently was not satisfied with the evidence that the State presented, and her vote alone would have been sufficient to deadlock the jury or cause the other jurors to consider reducing the degree of the offense for which they ultimately convicted Rowbottom. Accordingly, we conclude that the district court abused its discretion in denying Rowbottom's motion for a new trial.[7]

## CONCLUSION

The district court did not err in denying Rowbottom's suppression motions. The combined errors of permitting Rowbottom's mother to testify about inadmissible bad acts and pervasive and egregious juror misconduct, however, denied Rowbottom a fair trial. We therefore reverse the judgment of conviction and remand the matter for a new trial.

---

[7]Although we base our decision on the most flagrant and egregious misconduct that occurred, we note with grave concern that three jurors, or twenty-five percent of the jury, engaged in some form of misconduct during this trial. Misconduct in any form is inimical to the interests of justice and will not be tolerated. We therefore direct the lower courts to insure that juror misconduct does not occur by properly informing jurors of the importance of their role and of those activities which are prohibited. In addition to the mandatory admonishment pursuant to NRS 175.401, district judges should also admonish jurors in criminal cases that they are not to visit the crime scene or make any independent investigations.