HAROLD LYONS, Appellant, *v.* THE
STATE OF NEVADA, Respondent.

No. 19901

July 18, 1990                                    796 P.2d 210

[Rehearing denied December 18, 1990]

*Ward & Maglaras,* Las Vegas, for Appellant.

*Brian McKay,* Attorney General, Carson City; *Rex Bell,* District Attorney and *William T. Koot,* Deputy District Attorney, Clark County, for Respondent.

## OPINION

By the Court, ROSE, J.:

Appellant Harold Lyons (Lyons) was convicted and sentenced on five criminal counts relating to the manufacture of methamphetamine. The most important issue raised by this appeal is whether the district court erred by denying Mr. Lyons' day-of-trial request to represent himself *pro se*. We conclude that the district court did not abuse its discretion in denying Lyons' request under the facts of this case. Because Lyons' remaining contentions do not warrant reversal, we affirm the judgment of conviction in all respects.

### FACTS

Police conducted surveillance of several persons suspected of conspiring to manufacture methamphetamine. Officers observed purchases of large amounts of certain chemicals and laboratory glassware connected to a Las Vegas business. On March 2, 1985, based on their observations during surveillance, police arrested Lyons without a warrant in a U-Haul truck on suspicion of conspiracy to manufacture methamphetamine. Police secured the truck, and soon thereafter obtained a search warrant for the truck and several other locations relating to Lyons and several other members of the suspected conspiracy. Found in the truck which Lyons had been driving were large amounts of precursor chemicals for the manufacture of methamphetamine, as well as laboratory glassware.

Lyons and several other suspected co-conspirators were indicted by a Clark County grand jury in May 1985. On October 8, 1985, the indictment was dismissed without prejudice. On May 9, 1986, the grand jury returned a second indictment charging Lyons and several others with several drug-related counts.

Lyons was represented by attorney John Momot. On June 7, 1988, Momot moved to withdraw from the case, and the court granted the motion. On June 16, 1988, the date set to confirm another counsel for Lyons, the court minutes state that: "Mr. Lyons represented to [the] court he wants to get his own attorney,

and his son is going to help him do this;'' the court continued the matter for two weeks to give Lyons a chance to obtain counsel. Two weeks later, Lyons reported that he had been unable to obtain counsel. The court then attempted to appoint several attorneys for Lyons, but each attorney declined for various reasons. Finally, on August 2, 1988, James Mayberry was appointed as Lyons' counsel. On August 16, 1988, the court set the trial date at December 5, 1988, approximately two years and seven months after the second grand jury indictment.

On November 10, 1988, the court heard three motions submitted by Lyons' counsel James Mayberry, of which the court granted one (a motion to sever a count). On December 5, 1988, the first day of trial and immediately before scheduled *voir dire* of prospective jurors, Lyons moved the court for a postponement of the trial. Lyons said that he was dissatisfied with Mayberry because he failed to file certain motions. Lyons said that he had initially refused to accept Mayberry as counsel unless Mayberry promised to file certain pre-trial motions conceived of by Lyons, an assertion that Mayberry qualified by adding that he informed Lyons that he would file only motions he felt had some merit. Based on his dissatisfaction with Mayberry, Lyons requested the court to grant a postponement to give him time to hire another attorney of his own choosing, or, in the alternative, to proceed in *pro se*.

The district judge asked Mr. Lyons what other pretrial motions he wanted to file and Lyons stated a number of them, these motions generally dealing with the conduct of the grand jury in indicting Lyons and with the conduct of the prosecutor. The district court denied them all as either having already been heard or having no merit.

Mr. Lyons again repeated his request to represent himself or to hire an attorney to represent him in a way he considered proper, and the court's response reflected the frustration and impatience it felt with Lyons and his request for a postponement:

> Mr. Lyons, I gave you every opportunity to do that in the last year. I have tried every attorney in this town to be your counsel and they have basically refused.
>
> I now have a good attorney for you and we are going to go to trial with that attorney because you are not going to get along with any attorney.

The court stated that the written motions it had received directly from Lyons showed that he did not know how to present a written document to the court and that Lyons' statements that morning showed that he did not know how to present relevant

evidence. The court concluded that the case was too complicated for Lyons to represent himself and that Lyons was attempting to make a mockery of the court.

At trial, the State proved that the truck Lyons was driving when he was arrested contained chemicals and lab equipment sufficient to manufacture large amounts of methamphetamine. The State also proved that about 3.5 pounds of a substance identified as methamphetamine had been seized at a warehouse owned by another suspected co-conspirator, Walter Crutchfield. One Derek McClean, aka Joe Bentz, testified that he had manufactured methamphetamine at several locations, including Crutchfield's warehouse, and that Lyons had paid him $2,000 per week for manufacturing the drug.

The jury found Lyons guilty of one count each of: conspiracy to manufacture methamphetamine, possession of a controlled substance (ephedrine), attempt to manufacture methamphetamine, trafficking in methamphetamine in the amount of 400 grams or more, and racketeeering. The district court further found Lyons to be an habitual criminal pursuant to NRS 207.010(2), based on six prior felony convictions. The court sentenced Lyons to life without the possibility of parole based on this finding. Lyons was sentenced to various other terms of imprisonment, which run concurrent with the sentence of life without possibility of parole.

## LEGAL DISCUSSION

### I. *Lyons' request to exercise his sixth amendment right to self-representation.*

This case gives us the opportunity to review a defendant's right to represent himself and when that right must be asserted. This court has held that criminal defendants have an ''unqualified right'' to self-representation, so long as there is a voluntary and intelligent waiver of the right to counsel. Baker v. State, 97 Nev. 634, 636, 637 P.2d 1217, 1218 (1981) (citing Faretta v. California, 422 U.S. 806 (1975)). Additionally, the denial of this right is never subject to harmful error analysis; it is *per se* harmful. McKaskle v. Wiggins, 465 U.S. 168, 177 n.8 (1984). Although the constitutional right of self-representation is generally protected by the courts, courts sometimes permit self-representation to be denied, where: (1) the defendant's request for self-representation is untimely; (2) the request is equivocal; (3) the request is made solely for purposes of delay; (4) the defendant abuses the right of self-representation by disrupting the judicial

process; (5) the case is especially complex, requiring the assistance of counsel; or (6) the defendant is incompetent to voluntarily and intelligently waive his or her right to counsel. *See* 2 La Fave and Israel, *Criminal Procedure* § 11.5(d) (Supp. 1990) (collecting cases); Young v. State, 98 Nev. 467, 653 P.2d 153 (1982); *Baker, supra;* Block v. State, 95 Nev. 933, 604 P.2d 338 (1979); Schnepp v. State, 92 Nev. 557, 554 P.2d 1122 (1976); Ashcraft v. Florida, 465 So.2d 1374 (Fla.App. 1985).

Lyons argues that the district court erred in denying his day-of-trial request for a postponement to hire another attorney or to represent himself *pro se.* The district court denied his request for a continuance because he had already been represented by several attorneys and the case was too complicated and complex for him to represent himself. We conclude that the district court's denial was justified because this was an especially complex trial and because Lyons' request was untimely.

The trial below lasted ten days, with 20 appearances on the witness stand for the prosecution and 10 for the defense. Several of Lyons' possible defenses to the charge of running a methamphetamine lab were quite technical. These defenses required an understanding of both the possible legal and illegal uses of the chemicals and lab equipment found in the U-Haul, as well as the ability to communicate these technical facts to a jury. Additionally, this was a racketeering case described by prosecutors as involving the largest illicit methamphetamine manufacturing enterprise ever uncovered in Nevada. The State had to prove a series of transactions in order to demonstrate racketeering. Taken alone, any single purchase or movement of a precursor chemical by the conspirators might seem innocuous and legitimate. It was only by painstakingly piecing together numerous purchases, movements, statements and other transactions by the conspirators that the State could demonstrate beyond a reasonable doubt the existence of an organized and long-standing conspiracy to manufacture methamphetamine. In short, this was a racketeering case and was much more complex than the usual drug possession or trafficking case.

A court may deny a defendant's request to represent himself when a case is so complex that the defendant would virtually be denied a fair trial if allowed to proceed *pro se. See Ashcraft, supra.*[1] We conclude that the district court was correct in denying

---

[1] The district court stated that it believed Lyons' legal skills were inadequate to allow him to represent himself. While we affirm the court's decision because this case was complex, we note that a request for self-representation may *not* be denied solely because the court considers the defendant to lack reasonable *legal* skills or because of the inherent inconvenience often caused by *pro se* litigants. *See, e.g.,* U.S. v. Flewitt, 874 F.2d 669 (9th Cir. 1989).

Lyons' request on the ground that, as the court stated, "the trial is too complex."

Next is the issue of the timeliness of Lyons' request. The U.S. Supreme Court has not specifically addressed the element of timeliness of a request for self-representation. The cases from other jurisdictions state two main views on this issue. *See generally* 98 A.L.R.3d 13 § 15 (Supp. 1989). First, some courts hold that a request for self-representation is timely as a matter of law so long as it is made before the swearing of the jury. Other courts hold that a request may be denied as untimely where the request is not made a reasonable time before trial and there is no good cause justifying the lateness of the request. *See especially* People v. Windham, 560 P.2d 1187 (Cal. 1977), *cert. denied,* 434 U.S. 848 (1977), *reh'g den.,* 434 U.S. 961 (1977); People v. Hall, 150 Cal.Rptr. 628 (Ct.App. 1978) (holding that district court did not abuse its discretion in denying a day-of-trial request as untimely); People v. Herrera, 163 Cal.Rptr. 435 (Ct.App. 1980) (holding that district court abused its discretion in denying a day-of-trial request for self-representation because defendant did not request a continuance and there was justification for the lateness of the request). In *Baker,* we adopted the former view, holding that a request for self-representation made before the swearing of the jury is timely as a matter of law and may not be denied absent a showing of dilatory intent or some other ground for denial. We hereby adopt the view stated by *Windham* and overrule our *Baker* decision on this point.

The Court of Appeals of the State of Washington correctly notes that *Windham* creates three somewhat different standards regarding timeliness. First, if the request is made well before trial, the right to self-representation is timely as a matter of law and may not be denied absent a justification other than timeliness. Second, if the request is made shortly before or on the day of trial, the court may, in its discretion, deny the request as untimely unless there is reasonable cause to justify the lateness of the request. Third, if the request is made during trial, the court has a larger measure of discretion to grant or deny the request. *See* State v. Fritz, 585 P.2d 173 (Wash.Ct.App. 1978). The present case concerns the second of these three situations.

In accord with *Windham,* we believe that a district court should be permitted, in its discretion, to deny a request for self-representation on the ground of untimeliness alone, if the request

is not made within a reasonable time before commencement of trial or hearing and there is no showing of reasonable cause for the lateness of the request. If it is clear that the request comes early enough to allow the defendant to prepare for trial without need for a continuance, the request should be deemed timely. If there exists reasonable cause to justify a late request, the request must be granted. If there is no such reasonable cause, the court may deny a late request. There need not be a specific finding of dilatory intent, which is a separate and distinct basis for denial of the request. The district courts should set forth in the record the reasons for denying a defendant's request to represent himself. *See Windham, supra; Fritz, supra; Hall, supra.*

Like the court in *Windham,* we stress that our decision today must not be used to limit the exercise of the fundamental constitutional right of self-representation. The decision to grant or deny late requests resides in the sound discretion of the district courts. Indeed, we encourage district courts to accommodate defendants' requests where this can be done without undue disruption or delay.

Turning to the facts of this case, we conclude that the court's denial of Lyons' request was justified on grounds of timeliness. The request was made on the day trial was set to commence. Additionally, the record does not indicate good cause justifying the lateness of the request. The hearing on the last flurry of motions occurred about three and one-half weeks before trial. At this earlier time, Mr. Lyons had reason to know that his counsel would not file all the motions he had requested. Had Lyons made his request at the earlier time, he might not have needed the "postponement" he requested on the day of trial. Finally, Lyons' primary request was for a continuance, which would have delayed the trial. The State's case involved many witnesses and the trial actually lasted ten days. Thus, the State and the district court would have been seriously inconvenienced by the delay.

## II. *The legality of Lyons' arrest.*

Lyons' second principal argument is that police lacked sufficient probable cause of conspiracy to manufacture methamphetamine to justify Lyons' warrantless arrest and the subsequent search of the U-Haul truck pursuant to warrant. A warrantless felony arrest may be made if the arresting officer knows of facts and circumstances sufficient to lead a prudent person to believe that a felony was committed by the arrestee. *Block,* 95 Nev. at 935, 604 P.2d at 339. Applying *Block,* we hold that the arresting

officers had sufficient factual basis for both the arrest and the subsequent search of the truck.

Observations made by the police officers during surveillance clearly gave rise to a suspicion of drug activity. On February 27, 1985, Los Angeles Detective Craig Peterson observed a man later identified as Joe Bentz driving U-Haul #1 into the loading area of Deep Water Chemical Company in Carson, California, and observed him loading several drums or barrels into the U-Haul. A Deep Water employee told Peterson that Bentz was picking up an order of about 3,200 pounds of hydriotic acid on behalf of one Walter Crutchfield who ran a company called "Treat It" in Las Vegas; the employee pointed out that Bentz at first had offered to pay for the chemical with $22,400 in cash. Police followed Bentz. The next day, they observed Bentz purchase "numerous glass condensers" with cash and load them into the U-Haul. The police tailed Bentz, who drove the truck to 3000 Spokane Drive in Las Vegas. The Los Angeles police began cooperating with Las Vegas police. Las Vegas Detective Richard Travers informed Peterson that, on a tip from DEA agents, he had previously observed a 200-kilo shipment of ephedrine to Walter Crutchfield. Having investigated about fifty illicit drug labs, Peterson attested that hydriotic acid and ephedrine were precursor chemicals used together in the making of methamphetamine. Thus, the connection of these two chemicals and the lab equipment to Crutchfield created probable cause to believe there was illegal drug activity.

The events of the evening of March 1 and the early morning of March 2, 1985, are sufficient to connect Lyons with the illegal drug activity. On March 1, officers observed Lyons in the company of Bentz and Randall Burnside at the Horseshoe Casino. Bentz was followed and later observed at a 1407 Industrial Road property identified as belonging to Crutchfield loading U-Haul #1 with "buckets, barrels" and "miscellaneous types of glassware." At two other mini-storage facilities, Bentz and others were also observed loading items, including barrels which appeared to be chemical containers, into U-Haul #1 and a second U-Haul. Officers then followed Bentz and U-Haul #1 to a mobile home. Later they observed Lyons removing "numerous cardboard boxes" from the mobile home and loading them into U-Haul #1. Several hours later, at about 1:00 a.m. on March 2, officers observed two persons enter and begin driving U-Haul #1.

Lyons' best counter argument is that there was insufficient evidence that he personally was involved in any drug activity. For example, he might have been a legitimate trucker working for Crutchfield. He argues that officers could not be certain that he was actually moving drug paraphernalia because the truck had been loaded and unloaded so many times.

Despite this, other suspicious activities create a substantial and reasonable inference that Lyons' movements that evening were connected with illegal drug activity. One officer reported that, while he was gone from his vehicle during surveillance of U-Haul #1, someone slit his right rear tire. Also, when officers began following U-Haul #1 at 1:00 a.m. southbound on Boulder highway, they observed suspicious driving: the U-Haul would "continually" pull off the highway and turn off its lights, apparently in an attempt to see if anyone was tailing the truck. Finally, at about 3:15 a.m., U-Haul #1 changed its direction and began heading west at a high rate of speed (clocked by police at about 80 mph). The truck pulled behind a motel and turned off the headlights. Concluding that their surveillance had been compromised, officers decided to arrest the occupants of U-Haul #1. At the motel, they found Lyons and Randall Burnside crouched down behind the truck. Lyons and Burnside were arrested for conspiracy to manufacture methamphetamine.

Besides the facts above, two other things support the district court's finding of probable cause. First, it is appropriate to consider the expertise of police officers. 1 La Fave *Search and Seizure* § 3.2(c) (2d ed. 1987). In the subsequent affidavit for the search warrant for the truck, Detective Peterson, who had substantial experience in investigating drug labs, stated that, based on the above facts, it was his opinion that this was a methamphetamine operation. Second, a supportive case is U.S. v. Fooladi, 703 F.2d 180 (5th Cir. 1983) (officers observed suspect order glassware and receive shipment of a *single* precursor chemical, and officer smelled odors associated with manufacture of drugs coming from suspect's house; court held that, even though the above facts, "considered in isolation are quite innocent," when taken together the facts constituted probable cause for a search warrant).

In addition to the above facts, there was another observation made by the officers *after* the arrest, which officers used to obtain the warrant to search the truck. Specifically, one officer said he smelled odors associated with manufacture of methamphetamine coming from the truck. In district court, Lyons alleged that the officer must have been lying about the odors because the precursor chemicals later found in the truck were clearly odorless until combined. Lyons requested a special suppression hearing, known as a *Franks*[2] hearing, to examine the alleged falsehood, but the

[2]Franks v. Delaware, 438 U.S. 154 (1978).

court refused the request. Lyons contends that this was error. We disagree. A *Franks* hearing is not required if the alleged falsehood in an affidavit supporting a search warrant is not necessary to the finding of probable cause. *See* 2 La Fave *Search and Seizure, supra,* § 4.4(c) (collecting cases). We conclude that the surveillance observations *prior* to the arrest were sufficient to establish probable cause, independent of the alleged smell coming from the truck.

## CONCLUSION

Under the circumstances of this case, the district court's denial of Lyons' day-of-trial request to represent himself *pro se* was justified on the grounds of untimeliness and the complexity of the trial. Contrary to Lyons' contention, the observations made by police during surveillance created probable cause to support Lyons' arrest and the search of the truck. We have carefully considered Lyons' remaining contentions and conclude that they do not warrant reversal. Since the judgment is supported by substantial evidence as to each count, we hereby affirm the judgment in its entirety.

YOUNG, C. J., STEFFEN, SPRINGER and MOWBRAY, JJ., concur.