Rose, J.,
with whom Springer, J., joins, dissenting:
I dissent because I believe the jury verdict was infected by juror misconduct, there were insufficient grounds to strip Tanksley of his right to self-representation, and that Tanksley was improperly sentenced as a habitual criminal.
One juror had doubts about Tanksley’s guilt apparently because he was not convinced the bed stuffing in Tanksley’s cell could have been flammable. During the dinner recess, the juror ignited some mattress stuffing he had at home and found that it caught fire easily. When deliberations resumed, he informed the other jurors of the test, and shortly thereafter he changed his vote from not guilty to guilty. A unanimous guilty verdict was returned soon thereafter.
In Rowbottom v. State, 105 Nev. 472, 779 P.2d 934 (1989), a juror in a murder case conducted her own independent investigation into whether the victim could have exited the vehicle with *1005 her hands bound as the state claimed, and she also measured the driving times between locations to determine if the defendant had time to return to his apartment and obtain the murder weapon and ligatures before meeting the victim. The juror also examined gravel at the scene and compared it with gravel in photos taken when the victim’s body was discovered. While the juror did not disclose the independent tests she conducted to the other jurors in the guilt phase, we reversed the entire case because the extrajudicial investigations may well have influenced her vote. As we explained:
Even if the offending juror did not disclose her conclusions to the others during the guilt phase, she returned to and participated fully in the jury deliberations while being influenced, in whole or in part, by her out of court investigations. We cannot say beyond a reasonable doubt that in so participating she did not inject opinions developed as a result of her particularly egregious misconduct and thus infect the other jurors in their deliberations.
Id. at 486-87, 779 P.2d at 943 (footnote omitted). “Our judicial system guarantees every defendant a fair trial with impartial jurors deciding a case only on admissible evidence presented in court. Conduct which erodes these basic tenets will be presumed prejudicial.” Id.
It seems probable to me that the juror’s independent test on the mattress stuffing influenced his vote, and it may have reinforced the opinion of the other jurors when he communicated the test results to them. We have no idea whether the mattress stuffings were similar or equally flammable and thus cannot determine the reliability of the stuffings’ comparison. I cannot say that the independent test was harmless beyond a reasonable doubt, and following the Rowbottom precedent, I would reverse and remand for a new trial on this ground.
Additionally, Tanksley had requested the right to represent himself at trial. He had been given this right in his first trial on other charges (extortion) that preceded this trial by several weeks. When denying Tanksley’s request, the district court stated that Tanksley’s self-representation in the earlier extortion case was “pathetic,” “disruptive,” “self-defeating,” and “ineffective.” The district court denied Tanksley his right to represent himself in the arson case based solely on his conduct in the extortion case. While a defendant’s right to self-representation can be denied because he or she was or is unduly disruptive, I find insufficient evidence to support the district court’s denial on this basis.
*1006 The district court gave no specific examples of why Tanksley’s representation in the extortion case warranted a ruling denying him his right to self-representation in the arson case. Furthermore, neither the district court nor the parties incorporated the extortion case’s trial transcript into the record in the arson case. As such, there is nothing in the record in the arson case to support the district court’s ruling. At the September 27, 1994 status hearing, Tanksley disagreed with the district court; however, his conduct was hardly so disrespectful and contemptuous as to warrant denial of his right to self-representation. Three of the district court’s bases for denying Tanksley’s motion to represent himself — “pathetic,” “ineffective,” and “self-defeating” — are clearly irrelevant pursuant to Lyons v. State, 106 Nev. 438, 444 n.1, 796 P.2d 210, 217 n.1 (1990). Therefore, disruption was the only valid basis for the district court’s decision, and I believe that Tanksley’s disruption alone was insufficient to deny him his constitutional right to self-representation.
Illinois v. Allen, 397 U.S. 337, 346 (1970), clearly explains that behavior will be considered “disruptive” only if it is of an “extreme and aggravated nature.” In Allen, the defendant, during trial, threatened to kill the judge, argued with the judge in an abusive and disrespectful manner, threatened to disrupt the proceedings by constantly talking, and answered the judge’s questions with abusive and vile language. The judge repeatedly warned the defendant about his behavior and then expelled the defendant from the proceedings. Id. at 339-41. The United States Supreme Court concluded that Allen’s actions were of such an “extreme and aggravated nature” as to justify the judge’s remedial actions. Id. at 346.
Tanksley’s actions at the prior extortion trial were not nearly as egregious as were those of the defendant in Allen, and the majority has failed to explain why Tanksley’s actions were so “extreme and aggravated” that they warranted the district court’s ruling stripping Tanksley of a constitutional right. Tanksley made numerous objections without legal basis, asked legally improper questions during direct examinations, requested to wear sunglasses in court, requested a delay to subpoena witnesses and examine documents, and testified on his own behalf at length in a rambling fashion. Additionally, the district judge did not give Tanksley the same warnings that the judge issued in Allen. Finally, the district court took no remedial action in the extortion case and permitted Tanksley to represent himself throughout the case, thereby indicating that Tanksley’s representation in the extortion case was not overly disruptive. Therefore, it is clear that Tanksley’s actions were not of such an “extreme and aggravated nature” as to be considered “serious and obstructionist *1007 conduct” pursuant to Faretta and Allen. Rather, they were merely an “inherent inconvenience” caused by a pro se defendant. Lyons v. State, 106 Nev. 438, 444 n.1, 796 P.2d 210, 217 n.1 (1990). I conclude that the district court erred in denying Tanksley’s motion for self-representation.
I also believe that the district court abused its discretion in adjudicating Tanksley a habitual criminal and sentencing him to a term of life imprisonment with the possibility of parole.
The version of NRS 207.010(2) effective at the time of Tanksley’s conviction provided for an additional term of life imprisonment with or without the possibility of parole for a “habitual criminal,” which was defined as a person “who has previously been three times convicted, whether in this state or elsewhere, of any crime which under the laws of the situs of the crime or of this state would amount to a felony.” However, NRS 207.010(4), which was also in effect at the time of Tanksley’s conviction and which has since been renumbered,[1] stated that “[t]he trial judge may, at his discretion, dismiss a count under this section which is included in any indictment or information.” The purpose of this provision “is to permit dismissal ‘when the prior offenses are stale or trivial, or in other circumstances where an adjudication of habitual criminality would not serve the purposes of the statute or the interests of justice.’ ” Sessions v. State, 106 Nev. 186, 190, 789 P.2d 1242, 1244 (1990) (quoting French v. State, 98 Nev. 235, 237, 645 P.2d 440, 441 (1982)).
The habitual criminality statute “exists to enable the criminal justice system to deal determinedly with career criminals who pose a serious threat to public safety.” Sessions, 106 Nev. at 191, 789 P.2d at 1245. It may be an abuse of discretion for the court to enter a habitual criminal adjudication when the convictions used to support the adjudication are nonviolent and remote in time. Id.
I conclude that sentencing Tanksley as a habitual offender was an abuse of discretion because his crimes do not prove that he was a career criminal who posed a serious threat to society and sentencing him as such does not serve the interests of justice. The court based its habitual criminal sentence on the fact that Tanksley previously had been convicted for criminal mischief, assault, and being an ex-felon in possession of a firearm. However, the assault, which was Tanksley’s only violent crime, occurred eleven years prior to the arson, and no evidence was presented that he actually injured anybody. Additionally, the criminal mischief charge was for breaking a toilet and some glass and occurred sixteen years prior to the arson; this was a stale, trivial, non-violent crime. Finally, the ex-felon in possession of a *1008 firearm conviction occurred three years prior to the arson, and while it posed a potential for violence, it was not in itself a violent crime. I believe that at the very least, the district court should not have considered the criminal mischief charge and likely should not have considered the assault charge in assessing Tanksley eligibility for habitual criminal status.
Even if Tanksley is considered a career criminal, he does not appear to be a violent criminal who poses a “threat to public safety.” Tanksley obviously suffers from serious mental illness and most likely belongs in a mental hospital, not prison; therefore, sentencing him as a habitual criminal does not serve the interests of justice and was an abuse of discretion.

 This section was renumbered as NRS 207.010(2).