DAVID THOMAS ALWARD, Appellant, v.
THE STATE OF NEVADA, Respondent.

No. 24994

February 29, 1996 912 P.2d 243

*Rick Lawton and Associates,* Fallon; *Laura Wightman FitzSimmons,* Las Vegas, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Kevin Pasquale,* District Attorney, *Arthur E. Mallory,* Chief Deputy District Attorney and *Linda S. White,* Special Deputy District Attorney, Churchill County, for Respondent.

## OPINION

By the Court, SHEARING, J.:

Appellant David Thomas Alward appeals from the district court's denial of his motion for a new trial and from the judgment of conviction. Alward raises numerous contentions on appeal, including whether: (1) the State concealed its theory of the case, (2) the State violated NRS 173.045(2) by listing numerous witnesses, and only calling a few of those witnesses, (3) evidence pertaining to Alward's character was improperly introduced, (4) autopsy photographs numbered twenty and twenty-one were improperly admitted, (5) a compilation of portions of ''home videos'' was improperly admitted, (6) the prosecutor committed misconduct, (7) the district court erred in failing to instruct the jury on the voluntariness of Alward's post-*Miranda* statements, and (8) juror misconduct occurred. We determine that these claims are without merit.

However, we conclude that certain evidence obtained in violation of Alward's rights under the Fourth and Fifth Amendments of the United States Constitution and Article 1, sections 8 and 18 of the Nevada Constitution was erroneously admitted. Therefore, we reverse the judgment of conviction and remand the case for further proceedings consistent with this opinion.

### FACTS

On February 25, 1993, at approximately 5:00 p.m., appellant David Thomas Alward (Alward) flagged down a car carrying mineworkers near the Sand Mountain turnoff on Highway 50, east of Fallon. Alward told them that his girlfriend Kristina Marie Baxter (Baxter) had shot and killed herself with a .22 caliber handgun. Other workers arrived shortly thereafter in a truck equipped with a telephone, called for help, and waited with Alward until help arrived.

Sergeant Leonard Bogdanowicz and Nevada Highway Patrol Trooper Brian Jorgensen were the first officers to arrive. The officers asked Alward what happened, and Alward told them that he and his girlfriend Baxter were camping at Sand Mountain, that

they had argued, and that he went for a walk, heard a shot, and ran back to the tent. Alward repeatedly told Trooper Jorgensen that he did not want to be left alone. Trooper Jorgensen stayed with Alward while Sergeant Bogdanowicz went to look at the campsite.

Trooper Jorgensen asked Alward if he was armed. Alward replied that he was not and offered to submit to a search for weapons. The trooper conducted a pat-down search. Alward then waited in the patrol car with the trooper. While talking with the trooper in the patrol car, Alward stated that he did not know what happened to the gun that Baxter used to kill herself. Unbeknownst to Alward, Trooper Jorgensen tape-recorded their conversation.

Bogdanowicz's inspection of the campsite shortly after arriving at Sand Mountain revealed a tent that was zipped closed and a vehicle parked southwest of the tent. He noticed a bullet hole in the side of the tent with blonde hairs hanging from the hole. Bogdanowicz unzipped the tent and saw Baxter lying on the floor with a .38 caliber double action revolver in her left hand, her middle finger inside the trigger guard but behind the trigger. He stepped into the tent to verify that she had no pulse. The ambulance crew arrived, entered the tent, and checked Baxter for life signs. Photographs were taken of the body, which was then removed. A single bullet wound was present on the body, entering below the chin on the left side of the neck and exiting at the top of the head on the right side.

Upon returning to the patrol car, Sergeant Bogdanowicz, assisted by Trooper Jorgensen, "bagged" Alward's hands[1] in order to later perform an "atomic absorption" test for the presence of residue from firing a gun. Investigator Steuart, who had since arrived, instructed Sergeant Bogdanowicz to transport Alward to the Sheriff's department to be interviewed. The sergeant testified that, en route, Alward "was just talking to me."

Once at the Sheriff's department, Investigator James Wood conducted the "atomic absorption" test.[2] Wood testified later that he did not inform Alward that he did not have to submit to the test. Wood testified that "I asked him if he would work with me on it, and he said yeah." Wood interviewed Alward as he conducted the test. The interview was videotaped by a hidden cam-

---

[1]Sergeant Bogdanowicz testified that he was instructed to "bag" Alward's hands. This entailed placing paper bags over Alward's hands and taping them closed around his wrists.

[2]Another officer, Investigator Steuart, testified that the residue obtained from Alward's hands was not tested after all because it did not meet FBI laboratory criteria.

era. Wood prohibited Alward from making a telephone call and from washing his hands before the test was completed.

After approximately forty-five minutes of interrogation, Wood told Alward, "First thing I want you to do, now I don't want you to take this wrong because we're just not too sure what's going on yet, is . . . I want to read you your rights, okay?" Wood read Alward the *Miranda*[3] warnings, and then told him, "You can answer questions and stop at any point in time," to which Alward replied, "I don't want to stop. I want to get this over." Another officer, Investigator Greg Nelson, then entered the room. Wood and Nelson continued to question Alward, then left him alone in the interrogation room for ten minutes. When they returned, Nelson told Alward that a counselor was coming to speak with him. Wood introduced the counselor to Alward, saying, "She's the counselor that I told you about. . . . I'm going to leave you two alone to talk for a little while." A videotape recorded the interview with the "mental health" counselor through a special mirror in the interrogation room.

After the counselor left, Wood and Nelson reminded Alward that he had been read the *Miranda* warnings and began questioning him again. Over time, Alward altered his account of how Baxter died, eventually telling the investigators that he and Baxter argued in the tent, that he left the tent to shoot at a can to blow off steam, returned, threw the gun down on the sleeping bag, and watched Baxter pick it up and hold it to her head. Alward told the investigators that he tried to wrest the gun away from her, and it went off, killing her. Nelson told Alward that he was not going to be arrested, but that he would be "held" for his own protection. Alward was confined to jail on a "mental health hold" and was arrested pursuant to a warrant in the early morning hours of February 26, 1993. In all, Alward was interrogated at the Sheriff's department for four to five hours.

At approximately 5:30 p.m. on February 25, 1993, Investigators James Steuart and Daryl Horsley arrived to inspect the crime scene. As they approached the tent, Steuart and Horsley observed what appeared to be a single bullet hole in the side of the tent with a strand of hair hanging from it. Horsley collected the hairs hanging from the hole on the outside of the tent, which appeared to match the decedent's hair. From the inside of the tent, Horsley collected the .38 revolver, Baxter's eyeglasses, and her red notebook. These items were in plain view inside the tent. Steuart and Horsley left the site at approximately 11:00 p.m., zipped the tent closed, and called in other officers to guard the area overnight.

Horsley testified later that, on the following morning, February

---

[3]Miranda v. Arizona, 384 U.S. 436 (1966).

26, 1993, there was slight snowfall on the ground. Steuart and Horsley returned to finish "rough diagrams." They also "gathered all of the evidence inside of the tent, gathered the tent, and then gathered the truck and load[ed] all into evidence." A matchbox containing 9 millimeter and .45 caliber ammunition was discovered in the tent. Further, one pocket or pouch located on the inside of the tent, which is part of the tent, was found to contain one live .38 round and several empty .38 cartridges. Another similar pocket was found to contain another live .38 round. Two backpacks were also found inside the tent. One backpack contained Alward's writings.[4] From the bed of the pickup truck, investigators retrieved a 9 millimeter magazine and empty .38 brass casings.

An information was filed on March 2, 1993, charging Alward with the commission of murder with the use of a .38 caliber revolver. A preliminary hearing was held April 8, 1993, in justices' court, after which Alward was bound over to district court for trial. On July 28, 1993, Alward filed a motion to suppress the following:

> [All] evidence obtained without the benefit of a valid search warrant; all evidence secured after the detention of the defendant without the benefit of an arrest warrant; all evidence in written or recorded form arising out of evidence taken from the person, personal effects, living quarters, lockers, packages, cartons, clothing, vehicle, jail cell, or any other area protected by the right to privacy of the defendant; any [sic] all statements of the defendant.

On August 9, 1993, the district court conducted a hearing on the motion to suppress. At the hearing, Investigator Steuart testified that he was called "to investigate a gunshot wound to the head on a victim." Steuart testified that after investigating the tent, he "told Sergeant Bogdanowicz to take Alward to the Sheriff's office and to call out Investigator Jim Wood to come down and interview him." Steuart testified that no search warrant was obtained before conducting the search of the tent or the truck. Investigator Wood testified that he received a call asking him to go to the Sheriff's department to conduct an interview concerning a "possible suicide." No testimony indicated that the

---

[4]It appears that the backpack was closed. On direct examination, the prosecution asked Investigator Steuart whether he recognized the backpack, then inquired, "Is that one of the items that you looked into further, so to speak?" Steuart responded affirmatively. In addition, evidence was presented at trial indicating that Alward's writings were inside a blue folder located inside the backpack.

February 26th search was conducted pursuant to Alward's consent or for the purpose of making an inventory.

After the hearing on the motion to suppress, the district court determined that the investigation was carried out to determine whether a suicide had taken place and the circumstances surrounding it, that Alward was not placed in custody during the period before *Miranda* rights were given to Alward, and that the interrogation was to determine the proceedings that led up to the suicide. The district court further determined that Alward's "confession" after he was read the *Miranda* warnings was voluntary. Finally, the district court found that at no time was Alward illegally held until he evidenced a desire to commit suicide, but that "had the officers not held him at that time, they would have been accountable. . . . He was being legally held at that time to prevent him from harming himself." The district court also found that the mental health counselor was called in to determine whether Alward was suicidal and that Alward's rights were not violated in obtaining the counselor. The district court essentially rested its denial of the motion to suppress on its finding that Alward "is the one that instigated the investigation that led to the evidence being reviewed and secured by the law enforcement officials."

After this ruling, the parties discussed the prosecution's filing of a second amended Information which still alleged that Baxter was killed by a deadly weapon, but deleted mention of a .38 caliber revolver. Alward's counsel stated that "I'm not objecting. . . . it doesn't change our defense, and we are not going to be harmed. . . . I don't believe it changes the defense in any way or jeopardizes it in any way." The amended information was filed on August 10, 1993.

The trial began on August 10, 1993. At the conclusion of the trial, on August 27, 1993, the jury returned a verdict of guilty of second-degree murder with use of a deadly weapon. The district court sentenced Alward to two consecutive terms of life imprisonment. On September 1, 1993, Alward filed a motion for a new trial alleging judicial, prosecutorial, and juror misconduct. After a hearing, the district court denied the motion.[5] Alward appeals

---

[5]The district court made the following findings, among others:

 4. Defendant's allegations of judicial misconduct are wholly without foundation.

 5. The defendant's allegations of prosecutorial misconduct are predicated on the failure of the State to disclose its "second gun" theory. The evidence of record shows that the theory was developed by the State from the same evidence that had been made available to the defendant.

 6. The State had a duty to disclose evidence but not to interpret it for the defendant.

 7. The defendant suffered no prejudice by the State's failure to

from the district court's denial of his motion for a new trial, and from the judgment of conviction.

## DISCUSSION

*Search of the Tent and the Truck*

The State argues that Alward had no property or legitimate possessory interest in either the tent or the truck,[6] thus had no legitimate expectation of privacy in either the tent or truck, and therefore cannot challenge the lawfulness of the search and seizure.[7]

The Ninth Circuit Court of Appeals has addressed whether the Fourth Amendment[8] protects a person's privacy interests in a tent located on a public campground. In *United States v. Gooch,* 6

---

disclose its theory. The defendant produced an expert who adduced evidence which was contrary to the State's theory.

8. The allegations of prosecutorial misconduct are without foundation.

. . . .

10. Any discussion of penalty by some jurors was not pervasive or widespread and did not extend to the whole jury. Any such discussion was incidental and did not appear to in any way influence the jury's verdict or second degree murder.

11. Jurors were examined on their knowledge of handguns on voir dire where many prospective jurors expressed that they owned and knew how to use handguns.

. . . .

13. There is no evidence to suggest that the jurors conducted any independent investigation, experiment, or demonstration not previously suggested by the evidence in open court or that jurors, who professed to have knowledge of firearms, forced their views on other jurors or such views differed from or were contrary to the evidence presented at trial[.]

[6]In its reply brief, the State paints Alward as "a fugitive, having run away from home, taking 15-year-old Kristina with him. Alward took Kristina's mother's tent, backpacks and other camping equipment with him and vanished in Debra Alward's truck."

[7]Alward's lack of ownership of the tent does not preclude standing to challenge the lawfulness of the search. The tent was Alward's and Baxter's home for the duration of their trip. Alward had a legitimate expectation of privacy in the tent. This case is unlike the situation presented to us in Hicks v. State, 96 Nev. 82, 605 P.2d 219 (1980), where the defendant unsuccessfully asserted that his presence in another's apartment conferred standing upon him to challenge the lawfulness of the search of that apartment.

[8]The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and persons or things to be seized.

F.3d 673, 676, (9th Cir. 1993), the defendant, a camper in a public campground, was reportedly shooting at other campers. The police were summoned, and without seeking an arrest warrant, ordered Gooch out of his tent, patted him down, arrested him, and handcuffed and locked him in a patrol car. *Id.* The officers then ordered Gooch's companion out of the tent and searched the tent for the firearm, finding a loaded handgun under an air mattress. *Id.* The court concluded that Gooch had both a subjective and an objectively reasonable expectation of privacy in the tent, noting that camping in a public campground as opposed to on private land was of no consequence since the Fourth Amendment "protects people, not places." *Id.* at 676-77 (quoting Katz v. United States, 389 U.S. 347, 351 (1967)). Further, the court stated that "[t]he fact that the tent may be moved, alone, is not enough to remove the Fourth Amendment protections. As noted above, tents are protected under the Fourth Amendment like a more permanent structure. Also, a tent is more analogous to a (large) movable container than to a vehicle; the Fourth Amendment protects expectations of privacy in movable, closed containers." *Id.* at 677 (citations omitted).

We find the reasoning in *Gooch* persuasive. Alward had a subjective expectation of privacy in the tent and its contents. He manifested this expectation, at the very least, by leaving the tent, tent pouches, backpack and other containers closed. Alward had an objectively reasonable expectation of privacy in the tent and its contents as well. Simply because appellant camped on land managed by the Bureau of Land Management does not diminish his expectation of privacy. In Rakas v. Illinois, 439 U.S. 128, 143 (1978), the Supreme Court interpreted *Katz* to hold that " 'capacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place.' " Because Alward and Baxter chose to make a tent their temporary residence, as opposed to staying at a hotel, does not diminish Alward's expectation of privacy. Indeed, holding that temporary residence at a hotel ensures Fourth Amendment protections, while temporary residence in a tent does not, would limit the protections of the Fourth Amendment to those who could afford them. *See* Stoner v. California, 376 U.S. 483, 490 (1964); Phillips v. State, 106 Nev. 763, 801 P.2d 1363 (1990). Thus, we conclude that Alward had a reasonable expectation of privacy in the tent such that the warrantless search of the tent violated the Fourth Amendment. Of course, a warrantless search of the tent

would not have violated the Fourth Amendment had an exception to the warrant requirement existed.

The Fourth Amendment to the United States Constitution and Article 1, section 18, of the Nevada Constitution proscribe all unreasonable searches and seizures. The principle is well established that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz,* 389 U.S. at 354 (footnotes omitted); *Phillips,* 106 Nev. at 765, 801 P.2d at 1365. In all cases outside the exceptions to the warrant requirement, "the Fourth Amendment requires the interposition of a neutral and detached magistrate between the police and the 'persons, houses, papers, and effects' of citizens." Thompson v. Louisiana, 469 U.S. 17, 20 (1984). We review the lawfulness of a search de novo. *Gooch,* 6 F.3d 673, 676 (9th Cir. 1993).

One exception to the warrant requirement is the existence of exigent circumstances, including a medical emergency. Mincey v. Arizona, 437 U.S. 385, 392-93 (1978). However, a warrantless search must be "strictly circumscribed by the exigencies which justify its initiation." Terry v. Ohio, 392 U.S. 1, 25-26 (1967). In this case, the investigators may have had probable cause to search the tent—Alward initially related that Baxter had shot herself with a .22, and a .38 was found in Baxter's hand with her finger curiously lodged behind the trigger—but the investigators did not obtain a warrant to search. For such a search to be valid, it must fall within one of the narrow exceptions to the warrant requirement, as discussed in *Katz.* While there is no such thing as a "murder scene exception" to the warrant requirement, the Supreme Court has indicated that police may enter a residence without a warrant when "they reasonably believe that a person within is in need of immediate aid." *Mincey,* 437 U.S. at 392. Further, police "may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises." *Id.* The police "may also seize any evidence that is in plain view during the course of their legitimate emergency activities." *Id.* at 392-93. Thus, the scope of this warrantless emergency entry was limited to rendering any possible assistance to Baxter and securing a possible crime scene. Once the emergency dissipated, i.e., once police established that Baxter was dead, they could not search the premises simply because they were lawfully present. *See* Bass v. State, 732 S.W.2d 632 (Tex. Crim.

App. 1987); State v. Tyler, 598 S.W.2d 798 (Tenn. Crim. App. 1980).

There is no dispute that the officers' presence in the tent was initially lawful because Bogdanowicz, Steuart and Horsley were all part of the police response to Alward's call for help. Any items discovered in plain view in the tent, including the .38 revolver and the red notebook, were lawfully seized. Items discovered in plain view in the truck bed, including the 9 millimeter magazine and empty .38 brass casings, were likewise lawfully seized. Therefore, the district court properly denied Alward's pre-trial motion to suppress the .38 revolver, red notebook, 9 millimeter magazine, and empty .38 brass casings. However, other items seized in the search, either that evening or the following day pursuant to the general search of the entire tent and truck, should have been suppressed. Among the items seized from the tent which were not in plain view were Alward's writings, which were located in a backpack, and 9 millimeter bullets, which were located in a matchbox. Failure to obtain a warrant before searching inside closed containers in the tent and the truck necessitates suppression of this evidence, and the district court erred in failing to do so. *See* United States v. Villarrea, 963 F.2d 770, 773 (5th Cir. 1992) (individuals can manifest legitimate expectations of privacy in closed, opaque containers that conceal their contents from plain view).

Further, the warrantless search of closed containers inside the tent was not justified by any other exigent circumstance. Only the victim's body remained in the tent—Alward did not return to the tent after the police arrived, and Alward indicated to the police that no one else was camping with them at Sand Mountain. There is no indication in the record that officers could not return to Fallon to obtain a warrant or that they could not obtain a warrant telephonically. In addition, the tent was guarded after the police left the scene for the evening. The police obtained a warrant for Alward's arrest that night, and there is no reason why they could not have obtained a search warrant at that time, or earlier, as well. While the State argues that the inclement weather created an exigent circumstance, there is no indication that snowfall would destroy evidence, especially since the exhaustive search of the tent was not conducted until the following day anyway. Because no other exigent circumstances or other exception existed to justify the warrantless search, the search violated Alward's Fourth Amendment rights.

Where error of constitutional proportions has been committed,

a conviction of guilty may be allowed to stand if the error is determined to be harmless beyond a reasonable doubt. Obermeyer v. State, 97 Nev. 158, 162, 625 P.2d 95, 97 (1981). Here, we cannot say that the admission of items found in closed containers inside the tent was harmless. Bullets obtained from the matchbox led the prosecution to present the theory that Alward killed Baxter using a 9 millimeter weapon and then placed the .38 revolver in her hand. Expert testimony pertaining to the muzzle imprint on Baxter's neck supported this theory. More importantly, in closing argument, the prosecutor read some of Alward's writings that police recovered from inside the backpack, arguing that Alward's actions conformed with the ideas expressed therein.[9] The prosecutor argued that "[t]he evidence in this case

-----

[9]Specifically, in closing argument, the prosecutor stated, "that job [of summing up what has been proven in the trial] is really . . . already been done for me. Mr. Alward himself summed up this case . . . when he wrote this:

Beauty roses laughing, smiling; bleeding roses sobbing, sighing; torn apart love is lost, is it not love when it's not? Beauty roses running, flying; bleeding roses falling, dying; life blood crimson on the floor, can you tell me what's in store? Beauty roses free, and fine; bleeding roses, these are mine.

Bleeding roses torn apart, true love pouring from my heart; life blood crimson on the floor, look what you've done, you fucking whore. I've wasted so much time living this lie, listening to you say you deserve one more try.

Well, bitch, it's time to go. The time has come for your true colors to show. I still love you and always will, now I will show you that my love is real. My time has come, and yours has passed; my time has come, and yours has passed, and forever my love will last."

Later in his closing argument, the prosecutor recited another of Alward's "poems":

Now I think to those days of old when the love was good but the days were cold. Hate really hurts, but love burns worse.

Kiss me, kiss me, kiss me, whisper your name. Hold me, hold me, hold me, let me play your game.

I was strong, but you fucked up my mind. Help me understand it, I'm falling behind. Why did you do it, do it to me? Now help me, bitch, help me to see.

Hurt me, hurt me, hurt me, whisper my name. Kill me, kill me, kill me, now play my game.

Everybody tells me how you feel, so now I know that love isn't real. Love is a toy, it's a fucking game that never really works but who's to blame?

Kiss me, kiss me, kiss me, let me whisper your name. Hold me, hold me, hold me, fuck the games.

And another:

I hate your smile, I hate your laugh, I hate your fucking hair. I hate your lips, I hate your eyes, I hate your god damn stare. I tried to touch you, tried to taste you, tried to hold you near, but I couldn't get past your wall built of pain and fear. Tried so hard to break it down, but all

consists of three major sections, the defendant's writings, the scene of the crime, and the physical evidence . . . found there." Thus, we conclude that admission of the illegally seized evidence cannot be viewed as harmless error and, therefore, warrants reversal of Alward's conviction.

### Pre- and Post-Miranda Statements

*Miranda* established requirements to assure protection of the Fifth Amendment right against self-incrimination under "inherently coercive" circumstances. *Miranda,* 384 U.S. at 444-445. Pursuant to *Miranda,* a suspect may not be subjected to an interrogation in official "custody" unless that person has previously been advised of, and has knowingly and intelligently waived the following: the right to silence, the right to the presence of an attorney, and the right to appointed counsel if that person is indigent. *Id.* at 444. "Custody" means "a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983); *accord* Oregon v. Mathiason, 429 U.S. 492, 495 (1977).

The district court determined that Alward was not "in custody." We will not disturb the district court's determination of whether the defendant was "in custody" where that determination is supported by substantial evidence. Rowbottom v. State, 105 Nev. 472, 480, 779 P.2d 934, 939 (1989). In the instant case, however, we conclude that there is not substantial evidence to support the district court's determination that Alward was not "in custody."

Since Alward was not formally arrested at the scene, the pertinent inquiry, as with Fourth Amendment claims, "is how a reasonable man in the suspect's position would have understood his situation." Berkemer v. McCarty, 468 U.S. 420, 442 (1984). We consider the totality of the circumstances in deciding whether or not Alward was in custody; no single factor is dispositive. *E.g. Beheler,* 463 U.S. at 1125. Important considerations include the

that came down was me. Now you are gone, and so am I, at last I'm fucking free.

And yet another:

If you feel as to die, look to the sky, spread your wing, forget your things, release your soul and fly. Spring has come and passed you by, summer has been your time to fly. Fall was here and told you the truth, winter is your time to die.

following: (1) the site of the interrogation, (2) whether the investigation has focused on the subject, (3) whether the objective indicia of arrest are present, and (4) the length and form of questioning. People v. Celaya, 236 Cal. Rptr. 489, 492 (Ct. App. 1987).

Admittedly, Alward summoned police to the scene and "kept telling [Trooper Jorgensen] over and over not to leave him." However, shortly thereafter, Alward's hands were "bagged" to preserve incriminating evidence, and Sergeant Bogdanowicz took Alward to the Sheriff's department. Once Alward's hands were "bagged," he was incapable of leaving the area by hitchhiking or by driving, and he was incapable of dialing a telephone to request a ride from another or to call his family. The investigation focused on Alward at the point that police "bagged" his hands, since in so doing they attempted to preserve evidence with which to incriminate him. The bagging of Alward's hands occurred immediately after Bogdanowicz returned from the tent where he saw that the victim had her finger behind the trigger, not in front of it, making it unlikely that a suicide occurred. The interrogation at the Sheriff's department took place in a room used for interviews and equipped with a special mirror. Apart from the mental health counselor visit, only Alward and the investigators were present in the interview room. From this, we hold that a reasonable person in Alward's position would have concluded that he was under arrest. Any interrogation which took place after Alward's hands were bagged and before *Miranda* warnings were administered was therefore "custodial," and *Miranda* safeguards applied. Oregon v. Elstad, 470 U.S. 298, 306 (1985). The district court therefore erred in failing to suppress that part of the videotape which contains statements Alward made before the *Miranda* warnings were administered.

Appellant further contends that statements he made after receiving the *Miranda* warnings were the product of coercive interrogation tactics, and therefore, should have been suppressed.

In Passama v. State, 103 Nev. 212, 214, 735 P.2d 321, 323 (1987), this court listed several factors which are relevant in determining whether a defendant's statement was voluntary:

> [t]he youth of the accused; his lack of education or his low intelligence; the lack of any advice of constitutional rights; the length of detention; the repeated and prolonged nature of questioning; and the use of physical punishment such as the deprivation of food or sleep.

Only the length of detention is a factor here—Alward was questioned for several hours. However, during that time, there is no

indication in the record that any other factors were present which would detract from voluntariness. Alward had been read the *Miranda* warnings and voluntarily waived his rights. The investigators did not employ coercive interrogation techniques such as depriving Alward of food or sleep. Considering the totality of the circumstances, we conclude that Alward made the inculpatory statements voluntarily. Therefore, we hold that the district court properly admitted the statements which Alward made to police after receiving *Miranda* warnings and waiving his Fifth Amendment rights.

Alward further contends that statements he made at the Sheriff's department should have been suppressed because they were taken following an arrest which was unlawful because the police lacked probable cause at the time they "arrested" him, and because his detention violated NRS 171.123. The State casts Alward's detention as limited to the time that police conducted an investigation into suspected criminal conduct.

We have held that a warrantless felony arrest may be made if the arresting officer knows of facts and circumstances sufficient to lead a prudent person to believe that a felony was committed by the arrestee. Lyons v. State, 106 Nev. 438, 446, 796 P.2d 210, 215 (1990) (citing Block v. State, 95 Nev. 933, 935, 604 P.2d 338, 339 (1979)). We conclude that probable cause existed to justify an arrest since Alward's claim that Baxter committed suicide was inconsistent with the scene in the tent, which Sergeant Bogdanowicz had already investigated at the time Alward's hands were "bagged." Upon unzipping the tent, Sergeant Bogdanowicz noticed that Baxter's finger was behind the trigger, which was inconsistent with Alward's story of suicide. Therefore, Alward's "arrest" was not unlawful, and Alward's statements were properly not suppressed for this reason.

Finally, Alward contends that the statements he made after officers informed him of their discovery of items not in plain view at the scene should have been suppressed as the "fruit" of a Fourth Amendment violation. "[E]vidence will not be excluded as 'fruit' unless the illegality is at least the 'but for' cause of the discovery of the evidence. Suppression is not justified unless 'the challenged evidence is in some sense the product of illegal governmental activity.'" Segura v. United States, 468 U.S. 796, 815 (1984) (quoting United States v. Crews, 445 U.S. 463, 471 (1980)). Alward fails to specify exactly what the investigators referred to when they told Alward that evidence was discovered at the scene which indicated that he was lying when he stated that he

was not inside the tent when the gun was fired. According to our careful review of the record, the investigators never mentioned any illegal "fruit" during the interrogation. Thus, there is no indication in the instant case that the fruits of the illegal search resulted in the production of Alward's incriminating statements. Here, as in *Segura,* the illegal search of the tent did not contribute in any way to Alward making inculpatory statements.

*Mental Health Counselor Interview*

Alward contends that statements he made to the mental health counselor should have been suppressed since their admission violated state statutes regarding privilege, and violated his Fifth Amendment rights. The State responds that Alward's statements to the mental health counselor were properly admitted because "a reasonable person would not believe that the communication would be confidential or that a patient-therapist relationship was being established."

There is no evidence in the record that the counselor was a doctor, and statutes pertaining to the doctor-patient privilege are therefore inapplicable. Neither is there any indication in the record that the counselor was a social worker registered under NRS chapter 641B, or a "marriage and family therapist" under NRS 641A.060. Statutes pertaining to social worker-patient privilege and therapist-patient privilege are therefore inapplicable as well.

However, we conclude that the introduction of this evidence was unfair to Alward. Our review of the transcript and the videotape indicates that the communication appeared to be "confidential." Investigator Wood implied that the conversation with the mental health counselor was a private conversation when he introduced the counselor to Alward, saying, "She's the counselor that I told you about. . . . I'm going to leave you two alone to talk for a little while." The counselor also urged the departing investigator to close the door so that the interview could begin. These statements, accompanied by actually closing the door to the interview room and leaving Alward and the counselor alone in the room, appear to have been designed to make Alward believe that the conversation was going to be confidential. Therefore, we conclude that admission of the videotaped interview with the mental health counselor violated Alward's right to due process guaranteed by the Fourteenth Amendment to the United States Constitution. McKenna v. State, 98 Nev. 38, 39, 639 P.2d 557, 558 (1982) (fundamental unfairness, amounting to violation of the defendant's right to due process, for district court to permit court-appointed psychiatrist who examined the defendant to tes-

tify as to admissions the defendant made during that examination).

The interview with the mental health counselor does not contain probative new information. However, the videotape of the interview was an important part of the State's case in that it assisted in demonstrating Alward's guilt by showing how he changed his story over time. Therefore, we cannot conclude that this error was harmless beyond a reasonable doubt, Chapman v. California, 386 U.S. 18, 24 (1966), and we hold that the district court erred in failing to suppress it. Since we conclude that this portion of the videotape was improperly admitted on due process grounds, we do not reach Alward's Fifth Amendment argument.

## CONCLUSION

The judgment of conviction is reversed and the case is remanded for further proceedings consistent with this opinion.

YOUNG, SPRINGER, and ROSE, JJ., concur.

STEFFEN, C. J., dissenting:

Respectfully, I dissent.

The primary basis for the majority's reversal of Alward's judgment of conviction is based upon the conclusion that the State engaged in an unlawful search and seizure that produced incriminating evidence in violation of the Fourth Amendment. I disagree. Using what I consider to be common sense and compelling logic, the district court denied the defense motion to suppress on the basis that Alward "is the one that instigated the investigation that led to the evidence being reviewed and secured by the law enforcement officers."

Alward is the one who summoned help and directed the officers to the tent where the victim allegedly shot herself. Alward, who was seeking to convince officers that the death was a suicide, made no suggestion to the officers that they were not free to fully examine and investigate the scene of the victim's death. The tent, which belonged to the victim, was being shared by the two young people, and there is no indication that Alward intended to direct investigating officers to the body, and then invoke a constitutional right to restrict any search and investigation of the area to a time after which a search warrant was obtained.

I am unable to discern any aspect of "unreasonableness" to the search undertaken by the officers. Nor do I derive relevant meaning from the fact that the tent and truck housed closed containers. There is no reason to believe from what occurred before or after Alward summoned assistance, that he went about

closing containers so that the investigators he summoned would be foreclosed from gaining entry without a warrant. Indeed, a reasonable mind would conclude that when a person summons officers to what he or she describes as a suicide scene, the surviving witness would want the officers to freely seek evidence confirming the fact of suicide. In this case, it is clear that Alward hoped to convince the officers that the young woman indeed succumbed to her own act of suicide. It is ridiculous to assume that he would expect to appear credible in the face of restricting the officers' freedom of access to anything at the death scene pending the acquisition of a search warrant. This conclusion is especially cogent under circumstances where the victim and Alward were sharing such close and temporary quarters.

I have no difficulty distinguishing *Gooch* from the instant case. Gooch was firing at other campers and did not invite the assistance or presence of police officers in his tent. His expectation of privacy was not eliminated by an invitation of entry and investigation to law enforcement authorities. However, in the instant case, Alward sought assistance from the officers, and intended to convince them of his girlfriend's suicide. At the very least, he impliedly waived all right to an expectancy of privacy and consented to the officers' searching investigation.

Although there was trial error discussed by the majority, I would hold that the error was harmless beyond a reasonable doubt under the circumstances of this case.

For the reasons briefly outlined above, I would affirm the judgment of conviction entered against Alward pursuant to the verdict of the jury. I therefore dissent.