971 P.2d 813 (1998)
Johnnie MITCHELL, Appellant,
v.
The STATE of Nevada, Respondent.
No. 28990.
Supreme Court of Nevada.
December 30, 1998.
*815 Robert Lucherini, Las Vegas; Beckley, Singleton, Jemison, Cobeaga & List, Chtd. and Mario D. Valencia and Daniel F. Polsenberg, Las Vegas, for appellant.
Frankie Sue Del Papa, Attorney General, Carson City; Stewart L. Bell, District Attorney, and Christopher Laurent, Chief Deputy District Attorney, Clark County, for respondent.

OPINION
PER CURIAM.
Appellant Johnnie Mitchell was convicted of various charges arising out of a robbery of the San Remo Hotel and Casino (San Remo) in Las Vegas. On appeal, he asserts that his conviction was obtained in violation of his Fifth Amendment right against self-incrimination. In the alternative, Mitchell maintains that he was wrongly convicted of attempted murder on a theory of aiding and abetting because the State failed to prove that he had the requisite intent necessary to commit the crime. Finally, Mitchell asserts that his sentence was improperly enhanced because he did not possess the weapon used in the crimes, and that the district court vindictively imposed a harsher sentence on Mitchell because he refused to plea bargain.

FACTS
On August 28, 1993, at approximately 5:30 a.m., four young men entered the San Remo; two of them approached security guard Colin Keel and inquired as to the location of the restroom. Shortly thereafter, Keel saw the two men who had just approached him speaking with two other men standing by a slot machine. The four men appeared to be underage, so Keel approached them and requested identification. Because the men stated that they had no identification, Keel asked them to leave the premises and began walking with them towards the exit; three of the men were walking in front of Keel and one was at his side.
The man walking beside Keel, later identified as Donathan Smith, suddenly put a gun to Keel's head and said "You white mother____, I'm going to blow your brains out." Keel grabbed at the gun and began struggling with Smith; during the struggle, Keel saw two of the young men jump into the casino cage and identified Mitchell as one of the two. Keel saw the third of the four men standing by or walking up to the casino cage. As Keel and Smith continued to struggle, the gun discharged wounding Smith in the leg.
Keel subsequently grabbed the gun, pointed it at Smith's head, cocked the hammer, and pulled the trigger; however, the gun failed to fire. Keel kicked Smith and began to run through the casino warning patrons and calling for police; Keel turned around and Smith, who had regained possession of the gun, fired the gun at Keel. Smith shot at Keel one more time before all four of the men fled the San Remo.
Cashier Wilma Beck was on duty when the two young men jumped into the casino cage. Beck testified that she was working inside the cage when one of the men "got real close to [her] face ... stuck a gun up to [her] head and he said `This is a stick up. Get down. Don't move.'" Beck saw the other young man jump into the cage at around the same time. These two men proceeded to empty all of the unlocked cash drawers inside the cage as Wilma lay on the floor. Prior to Mitchell's trial, Beck identified Mitchell as the man who had jumped into the cage and threatened her with a gun; at trial, she stated that she was "100 percent sure" that Mitchell was the man who had threatened her on the morning of August 28, 1993.
Several other San Remo employees and guests present at the robbery corroborated Keel's and Beck's testimony, but none of these other witnesses was able to identify Mitchell. There were discrepancies between some of the witnesses as to the number of shots fired that morning, although most reported hearing two gunshots. Before taking cover behind a slot machine, one guest saw a *816 young man holding a gun and standing inside the casino cage. Later, the guest crawled toward the exit, then she saw the same man standing outside of the cage checking his gun next to another young man who looked at his watch and stated "It's already been one minute, let's hurry up and get out of here."
A San Remo craps dealer testified that two of the four young men had been armedthe man struggling with Keel and one of the men who had jumped into the casino cage. The dealer stated that a fourth man was "making the other guys inside ... hurry up." A San Remo "change girl" testified that she had seen only one gun, which had been held by the man struggling with Keel. A Las Vegas Metropolitan Police Department (LVMPD) crime analyst testified that he had discovered one bullet lodged in a wall south of the casino cage. The crime analyst also discovered two cartridges and a casing on the floor just outside of the cage.
Sometime after the San Remo robbery, California law enforcement officials arrested Smith in his Los Angeles neighborhood. It is not clear whether Smith was arrested for the San Remo charges or other charges at this time. In any event, on September 9, 1993, LVMPD Detectives Donald Tremel and Michael Karstedt interviewed Smith at the East Lake Juvenile Home in California with regard to the San Remo robbery (Smith was sixteen years old at the time). During this meeting, Smith confessed to his role in the robbery and provided Dets. Tremel and Karstedt with the "street" monikers of the other three young men involved in the crime, including "Baby D." Smith told the detectives that Baby D had been armed during the San Remo robbery.
Smith was subsequently extradited to Las Vegas where, in a December 7, 1993 statement and photographic lineup, he identified a photograph of Mitchell as being that of Baby D. Smith signed and dated the back of Mitchell's photograph at this time. Transcripts and tape recordings of Smith's September and December 1993 interviews with Dets. Tremel and Karstedt were admitted into evidence at Mitchell's trial.
At Mitchell's trial, Smith told the district court outside the presence of the jury that he would not testify because he had received threats in prison about being a "snitch." However, shortly thereafter, Smith did testify in front of the jury; he denied knowing or having ever seen Mitchell and stated that he could not identify Mitchell as a participant in the San Remo robbery. Although he admitted that his initials were on the back of Mitchell's photograph, Smith denied having previously identified Mitchell in the photographic lineup. Smith stated that all of the people who were with him knew that he was carrying a gun when they entered the San Remo.
Dets. Tremel and Karstedt testified that on January 7, 1994, following Smith's photographic identification of Mitchell, they met with Mitchell for the first time at Soledad Prison in California where Mitchell was incarcerated on unrelated charges. Det. Karstedt testified that Mitchell had not allowed this meeting to be recorded. According to the detectives, they met with Mitchell in an unlocked office inside of the prison library. The library was closed for the day, and pursuant to standard prison procedure, the library exit doors were locked; a prison guard stood outside of the office for a "short time."
The detectives informed Mitchell that the purpose of their visit was to discuss his possible involvement in the San Remo robbery; they purportedly told Mitchell that he could end the interview at any time and be returned to his cell. Mitchell was not handcuffed during the meeting, and he was not under arrest for any crimes arising out of the San Remo robbery. Det. Tremel described the atmosphere of the interview as "very casual." Neither detective informed Mitchell of his Miranda rights in the course of the two-hour interview during which Mitchell admitted he had gone to the San Remo with Smith and two others on the morning of the robbery. Mitchell claimed that he had been unaware that a robbery was to take place and took no part in the criminal activity.
The State ultimately charged Mitchell by way of an amended information with the following: Count Iattempted murder with use of a deadly weapon; Count IIburglary in possession of a deadly weapon; Count *817 IIIconspiracy to commit a robbery; Count IVrobbery with use of a deadly weapon; and Count Vpossession of firearm by an ex-felon. At the June 8-9, 1995 jury trial on these charges, Mitchell testified on his own behalf.
Initially, Mitchell testified that on the morning of the robbery, he arrived with Smith at the San Remo. However, Mitchell claimed that he was at the San Remo waiting for a friend, Wayne Williams, and denied carrying a weapon or participating in the robbery in any way. When asked why Williams was not testifying on his behalf, Mitchell stated that he had been unable to find Williams or Williams' girlfriend at whose house he had previously stayed in Las Vegas.
Although on direct examination Mitchell claimed that he had arrived at the San Remo with Smith, on cross-examination he stated that he never met Smith and that at the time of the robbery, Mitchell and Williams were outside of the San Remo in a parking lot. Mitchell acknowledged that he was known as Baby D. With regard to the Soledad Prison meeting with Dets. Tremel and Karstedt, Mitchell claimed that he never told the detectives not to record his statement. He also claimed that the detectives were lying about Mitchell having admitted to going inside the casino with Smith. Mitchell testified that although the detectives had informed him that he was not a suspect, they had not advised him that he was free to leave at any time during the interview. Mitchell testified that he had initially thought he was being taken to a meeting with lawyers rather than detectives.
At the conclusion of Mitchell's trial, the jury returned a verdict of guilty on all counts except Count Vex-felon in possession of a firearm. On August 14, 1995, the district court sentenced Mitchell to the following: Count I (attempted murder)twenty years in prison plus a consecutive twenty years for the weapon enhancement, and $81,053.37 in restitution; Count II (burglary)ten years concurrent with Count I; Count III (conspiracy to commit robbery) six years concurrent with Counts I and II; and Count IV (robbery)six years plus a consecutive six years for the weapon enhancement to be served consecutively with Count I. Mitchell received a total consecutive sentence of fifty-two years.
Mitchell appeals from his conviction and sentence alleging that he lacked the requisite intent for attempted murder, the jury was improperly instructed, the State's closing arguments exacerbated these deficiencies, and the charging information was inadequate. He further asserts that evidence of his statements to detectives at Soledad Prison were admitted in violation of his Fifth Amendment rights. Finally, Mitchell contends that the district court erred in applying the weapon enhancement to his sentence and maintains that the lower court punished him with a harsher sentence because he chose to exercise his right to trial.

DISCUSSION

Appellant's prison statements to detectives were properly admitted.
Mitchell contends that he is entitled to a new trial on all charges because Dets. Tremel and Karstedt were allowed to testify as to Mitchell's incriminating statements at Soledad Prison, in violation of his Fifth Amendment right against self-incrimination. U.S. Const. amend. V. Mitchell asserts that he was "in custody" at the time of the interview with the detectives and, therefore, he should have been given Miranda warnings.
Whether a defendant is constitutionally entitled to Miranda warnings is a question of law reviewed de novo. U.S. v. Turner, 28 F.3d 981, 983 (9th Cir.1994). However, a district court's determination as to whether a defendant was "in custody" will not be disturbed where there is substantial evidence in support of its determination. Alward v. State, 112 Nev. 141, 154, 912 P.2d 243, 252 (1996). In the instant case, the district court found that Mitchell was not "in custody" for purposes of admitting the detectives' testimony regarding Mitchell's statements at Soledad Prison. We agree.
In Alward, 112 Nev. at 154, 912 P.2d at 251, we reiterated that "a suspect may not be subjected to an interrogation in official `custody' unless that person has previously *818 been advised of, and has knowingly and intelligently waived [his or her Miranda rights]." We stated that the test for determining whether a defendant who has not been arrested is in custody "`is how a reasonable man in the suspect's position would have understood his situation.'" Id. at 154, 912 P.2d at 252 (quoting Berkemer v. McCarty, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)). The court will consider the totality of the circumstances, including: (1) the site of interrogation; (2) whether the investigation has focused on the suspect; (3) whether the objective indicia of arrest are present; and (4) the length and form of questioning. Id. at 154-55, 912 P.2d at 252.
Prison inmates are not automatically deemed to be "per se `in custody.'" Turner, 28 F.3d at 983. The Turner court explained:
[T]o determine whether Miranda warnings were necessary in a prison setting, "we look to some act which places further limitations on the prisoner." ... Under this concept, we consider "the language used to summon the individual, the physical surroundings of the interrogation, the extent to which he is confronted with evidence of his guilt, and the additional pressure exerted to detain him ... to determine whether a reasonable person would believe there had been a restriction of his freedom over and above that in his normal prisoner setting.
Id. at 983 (quoting Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968)).
Notwithstanding Mitchell's assertions to the contrary, we conclude that, based on the totality of the circumstances, Mitchell was not "in custody" for purposes of Miranda. Cf. Walker v. State, 102 Nev. 290, 720 P.2d 700 (1986) (concluding that inmate interviewed in his cell by prison investigator was "in custody"). The two-hour interview at Soledad Prison took place in an unlocked room, Mitchell was not under arrest for the San Remo robbery at the time, and the detectives testified that they told Mitchell that although he was a suspect in the robbery, he could leave the interview at any time.
Therefore, even though Mitchell was not given Miranda warnings, the detectives' testimony that during the prison interview Mitchell had acknowledged being present at the San Remo was properly admitted. We must now consider Mitchell's remaining contentions as to the validity of his conviction for attempted murder.

Appellant was properly convicted of attempted murder.
The State charged Mitchell with attempting to kill Keel by aiding and abetting Smith's attempt to kill Keel. Mitchell maintains that he is entitled to a reversal of his conviction for attempted murder with a deadly weapon and its attendant forty-year sentence. We disagree.

The indictment contained sufficient information.
Mitchell asserts that the indictment was insufficient because it failed to provide information on Mitchell's specific acts that constituted aiding and abetting so as to enable him to prepare an adequate defense. Specifically, Mitchell contends that he was not aware until the prosecutor's closing argument that the State was pursuing the theory that Mitchell committed attempted murder by aiding and abetting as a "look-out." We disagree.
In Barren v. State, 99 Nev. 661, 668, 669 P.2d 725, 729 (1983), we held that where a prosecutor seeks to prove a defendant's guilt for aiding and abetting, "the indictment should specifically allege the defendant aided and abetted, and should provide additional information as to the specific acts constituting the means of the aiding and abetting so as to afford the defendant adequate notice to prepare his defense." (footnote and citations omitted.) We have noted that the rationale underlying this requirement for specificity in the indictment was "to comport with accepted notions of due process" by preventing the state from concealing its basic factual theories underlying the case or vacillating in its theories during trial. Id., see also Point v. State, 102 Nev. 143, 148-49, 717 P.2d 38, 42 (1986).
*819 In relevant part, Mitchell's indictment provides:
COUNT IATTEMPT MURDER WITH USE OF A DEADLY WEAPON
[Mitchell] did then and there, without authority of law and malice aforethought, willfully and feloniously attempt to kill COLIN KEEL, a human being, by shooting at the said COLIN KEEL with a deadly weapon, to-wit: a firearm, by Defendant DONATHAN SMITH directly committing said act and Defendant JOHNNIE MITHCELL aiding or abetting its commission through counsel and encouragement in order to carry out the acts as set forth in Count IV.

....

COUNT IV ROBBERY WITH USE OF A DEADLY WEAPON
[Mitchell] did then and there willfully, unlawfully, and feloniously take personal property, to-wit: lawful money of the United States, from the person of WILMA BECK, using a deadly weapon, to-wit: a firearm, during the commission of said crime, Defendant JOHNNIE MITCHELL directly committing said act or aiding or abetting in its commission by acting in concert with others by taking some money from WILMA BECK and/or acting as a look-out during the entire incident.

(emphasis added).
In our view, this indictment provides sufficient information concerning the specific acts that constituted aiding and abetting so as to afford Mitchell adequate notice to prepare his defense. Count IV describes Mitchell's specific acts of aiding and abetting robbery as "acting in concert" with others by "taking some money" and as "acting as a look-out." Moreover, Count I incorporates by reference the specific acts mentioned in Count IV through incorporation of the language "in order to carry out the acts as set forth in Count IV." NRS 173.075 explicitly provides that allegations in one count may be incorporated by reference in another count.[1] Therefore, based on the plain language in Count IV of the indictment, the State put Mitchell on notice that the State was pursuing the theory that Mitchell was criminally liable for attempted murder based on his actions as a "look-out."
Accordingly, we conclude that Mitchell's contention lacks merit because the indictment was sufficiently detailed.

Failure to object precludes appellate review.
Mitchell next contends that his conviction should be reversed because the jury instruction coupled with the prosecutor's closing argument led the jury to believe that Mitchell committed attempted murder merely by aiding and abetting the robbery, even though Mitchell did not have the specific intent to Kill. Mitchell raises this assertion for the first time on appeal. At trial, Mitchell explicitly represented to the district court that he had no objections to the jury instructions. Similarly, Mitchell failed to object during the prosecutor's allegedly improper closing argument.
Repeatedly, we have held that failure to object to alleged errors at trial generally precludes review of an issue on appeal. McCullough v. State, 99 Nev. 72, 74, 657 P.2d 1157, 1158 (1983); see also Etcheverry v. State, 107 Nev. 782, 784, 821 P.2d 350, 351 (1991); Wilkins v. State, 96 Nev. 367, 371, 609 P.2d 309, 312 (1980). Although we may address plain or constitutional error sua sponte despite an appellant's failure to object, we are convinced that Mitchell's asserted errors do not rise to the level of plain or constitutional error.
Notwithstanding our conclusion that Mitchell's failure to object precludes our review of this issue, we now take this opportunity to clarify whether aiding and abetting establishes the requisite specific intent necessary to sustain an attempted murder conviction.[2] We reject Mitchell's assertion that one *820 may never be convicted of attempted murder as an aider and abettor in the absence of a specific intent to kill. Rather, we conclude that a conviction for attempted murder cannot lie absent a finding that the attempted murder was at least a "natural and probable consequence" of the crime aided and abetted by the defendant. See People v. Prettyman, 14 Cal.4th 248, 58 Cal.Rptr.2d 827, 926 P.2d 1013, 1019 (Cal.1996) (explaining that aider and abettor may be held liable not only for the planned or target crime, but also for any other offenses committed by the confederate that are the natural and probable consequence of the target crime).
The natural and probable consequence doctrine is a product of the common law and is based on the rationale that aiders and abettors are criminally responsible for all harms that are a natural, probable, and foreseeable result of their actions. Id. (citations omitted). We approve of this rationale and further approve of California's jury instruction on this issue, which provides in part:
One who aids and abets [another] in the commission of a crime [or crimes] is not only guilty of [that crime] [those crimes], but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crime[s] originally aided and abetted.
In order to find the defendant guilty of the crime[s] of ____, [as charged in Count[s] ____,] you must be satisfied beyond a reasonable doubt that:
(1) The crime [or crimes] of ____ [was] [were] committed,
(2) The defendant aided and abetted such crime[s],
(3) A co-principal in such crime committed the crime[s] of ____, and
(4) The crime[s] of ____ was [were] a natural and probable consequence of the commission of the crime[s] of ____.
Prettyman, 58 Cal.Rptr.2d 827, 926 P.2d at 1018 n. 3.[3]
Accordingly, a conviction for attempted murder will lie even if the defendant did not have the specific intent to kill provided the attempted murder was the natural and probable consequence of the aider and abettor's target crime.

Mitchell was not vindictively sentenced.
Mitchell next contends that the district court vindictively sentenced him to a term of fifty-two years in prison because Mitchell opted to exercise his constitutional right to a jury trial rather than accept a plea bargain. We disagree.
It is well established that a sentencing court may not punish a defendant for exercising his constitutional rights and that vindictiveness must play no part in the sentencing of a defendant. North Carolina v. Pearce, 395 U.S. 711, 724, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), overruled in part by Alabama v. Smith, 490 U.S. 794, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989); U.S. v. Medina-Cervantes, 690 F.2d 715, 716 (9th Cir.1982). The defendant has the burden to provide evidence that the district court sentenced him vindictively. Smith, 490 U.S. at 794, 109 S.Ct. 2201.
In the case at bar, Mitchell alleges that the district court's sole justification for Mitchell's severe sentence was Mitchell's refusal to accept the plea. However, we are persuaded that the district court had legitimate *821 reasons for Mitchell's sentence including to deter others[4] and to punish Mitchell.[5] Moreover, we note that the district court's reference to Mitchell's refusal to plea bargain was made in response to Mitchell's request for a sentence similar to his co-conspirators who had negotiated lenient sentences in exchange for guilty pleas. We see no evidence of vindictive sentencing in the mere fact that the district court explained the justification for Mitchell's co-conspirators' lenient sentences. Cf. Smith, 490 U.S. at 802, 109 S.Ct. 2201 ("and we have upheld the prosecutorial practice of threatening a defendant with increased charges if he does not plead guilty, and following through on that threat if the defendant insists on his right to stand trial") (citations omitted).
Accordingly, we conclude the district court did not vindictively sentence Mitchell because he exercised his constitutional right to a trial.

The robbery weapon enhancement was proper.
In Anderson v. State, 95 Nev. 625, 629-30, 600 P.2d 241, 243-44 (1979), we held:
[T]he participation of a defendant not actually in possession of the weapon by aiding and abetting the actual user in the unlawful use of the weapon, makes the former equally subject to the added penalty inflicted upon defendants who commit crimes through the use of deadly weapons....
....
... When one of two robbers holds a victim at bay with a gun and the other relieves the victim of his properties, or, as in the instant case, the unarmed assailant has knowledge of the use of the gun and by his actual presence participates in the robbery, the unarmed offender benefits from the use of the other robber's weapon, adopting derivatively its lethal potential.
... [T]he possession necessary to justify statutory enhancement may be actual or constructive; it may be exclusive or joint. Constructive or joint possession may occur only where the unarmed participant has knowledge of the other offender's being armed, and where the unarmed offender has, as here, the ability to exercise control over the firearm.
(Citations omitted.) (Emphasis added.) Cf. Walters v. State, 106 Nev. 45, 48-49, 786 P.2d 1202, 1204 (1990) (holding that the defendant's sentence had been improperly enhanced where there was no evidence that the defendant constructively possessed or exercised control over the weapon), superseded on other grounds by 108 Nev. 186, 825 P.2d 1237 (1992).[6]
*822 Due to Mitchell's participation in an armed robbery, with or without his physical possession of a gun, the jury could have found that Mitchell had constructive possession of a weapon under Anderson. Accordingly, we conclude that Mitchell's sentence enhancement was not erroneous.

CONCLUSION
We conclude that the district court did not err in admitting evidence of Mitchell's statements to detectives while incarcerated at Soledad Prison. Additionally, we decline to address the issue of whether the jury instruction coupled with the prosecutor's argument was improper because Mitchell failed to object. Furthermore, we hereby expressly adopt the natural and probable consequence doctrine and hold that aiders and abettors may be criminally liable for attempted murder absent a specific intent to kill if the attempted murder was the natural and probable consequence of the target offense. Finally, with regard to Mitchell's fifty-two year sentence, we conclude that it was proper.
Accordingly, we affirm Mitchell's attempted murder conviction and its attendant sentence.
SPRINGER, C.J., dissenting.
Today the court adopts a new "doctrine" of criminal liability in cases in which an aider and abettor is charged with attempted murder. The court "hold[s] that a conviction for attempted murder will stand even if the defendant did not have the specific intent to kill, provided the attempted murder was the natural and probable consequence of the aider and abettor's target crime."
I have no quarrel with the new doctrine; what disturbs me about the majority's affirming Mitchell's attempted murder conviction is that Mitchell did not know at the time of his trial that this court was going to adopt the new doctrine; and, even more importantly, the jury did not know about the doctrine either.
The majority holds Mitchell responsible for requesting that the district court give a "natural and probable consequences" instruction, even though this was not the law at the time. Because Mitchell did not object to the instructions as given, the majority refuses to "review ... [the instruction] on appeal." I do not think that it is fair to require Mitchell to have offered this new doctrine in the form of an instruction before it was the law of this state.
NOTES
[1] NRS 173.075(2) provides that:

Allegations made in one count may be incorporated by reference in another count. It may be alleged in a single count that the means by which the defendant committed the offense are unknown or that he committed it by one or more specified means.
[2] An individual who aids and abets the commission of a felony is treated as a principal in the crime as defined by NRS 195.020:

Every person concerned in the commission of a felony ... whether he directly commits the act constituting the offense, or aids or abets in its commission, and whether present or absent; and every person who, directly or indirectly, counsels, encourages, hires, commands, induces or otherwise procures another to commit a felony ... is a principal, and shall be proceeded against and punished as such. The fact that the person aided, abetted, counseled, encouraged, hired, commanded, induced or procured, could not or did not entertain a criminal intent shall not be a defense to any person aiding, abetting, counseling, encouraging, hiring, commanding, inducing or procuring him.
[3] Although we now articulate the appropriate method by which juries should be instructed on aiding and abetting the crime of attempted murder, we note that the instruction actually given below, which was consistent with NRS 195.020, adequately communicated the law regarding this issue. Hereafter, however, the instruction approved herein must be given.
[4] The deterrent nature of Mitchell's sentence is evidenced from the following statement made by the district court:

If a defendant doesn't want to plead, what are we going to do, we have to go to trial. It takes a lot of time and effort, but everybody is entitled to a fair jury trial. I hope a message goes out to the so-called, whatever they call them, gang bangers coming into Las Vegas and scaring the hell out of our tourists and citizens here, shooting them up, robbing. I do not know if the message is going to go out but I certainly hope the newspaper picks it up and the message goes out that at least this county won't tolerate that.
[5] In imposing Mitchell's sentence, the district court considered Mitchell's pre-sentence report that detailed his past crimes:

[Y]ou're only 24, 25 years old, you have two felony convictions, you got juvenile arrests dating back to 1986, controlled substance charge while a juvenile, '87 armed robbery. You were found guilty. You were committed to the California Youth Authorities. You were paroled. Then you again get involved in drugs as a juvenile. Then as an adult in 1991 you commit a robbery. You used a handgun and robbed a store clerk. You were convicted of second degree robbery with a firearm. You were sentenced to three years and you were paroled. You were paroled. Your parole was revoked. And then you got involved in this dastardly crime, a crime that has consequences in this community, attempted murder with the use of a deadly weapon and robbery.
[6] Relying on Walters, Mitchell notes that the jury acquitted him of being an ex-felon in possession of a firearm (Count V), and concludes that, therefore, the jury must have believed that he merely served as a lookout during the robbery and could not have been in possession of a weapon for purposes of sentence enhancement. The jury acquitted Mitchell of being an ex-felon in possession of a firearm, yet convicted him of burglary while in possession of a deadly weapon. Therefore, the fact that the jury acquitted on the ex-felon charge is not dispositive as to whether Mitchell had possession of a weapon.